329 F.2d 11
 Charles H. RUBY, as President of the Air Line Pilots Association, International, and Air Line Pilots Association, International, an unincorporated association, Plaintiffs,
v.
AMERICAN AIRLINES, INC., Defendant-Appellant, and
Nicholas J. O'Connell, Jr., individually and as Chairman of the Master Executive Council of the pilots in the service of American Airlines, Inc., and the Negotiating Committee of said pilots, consisting of Richard Lyons, Robert T. Guba, Joseph Garvey, Paul Atkins and Nicholas J. O'Connell, Jr., ex officio, Additional Defendants-Additional Appellants.
Joseph V. Manning, as President of the American Airlines Chapter, Flight Engineers' International Association, AFL-CIO, and American Airlines Chapter, Flight Engineers' International Association, AFL-CIO, an unincorporated association, Intervenors-Appellees.
 No. 178.
 Docket 28473.
 United States Court of Appeals Second Circuit.
 Argued October 22, 1963.
 Decided February 14, 1964.
 
 Arthur M. Wisehart, New York City (George A. Spater and H. Wayne Wile, New York City, on the brief), for defendant-appellant.
 Martin C. Seham, New York City, for additional defendants-appellants.
 Asher W. Schwartz, New York City (Walter N. Kaufman and O'Donnell & Schwartz, New York City, on the brief), for intervenors-appellees.
 Before LUMBARD, Chief Judge, and MEDINA and FRIENDLY, Circuit Judges.
 MEDINA, Circuit Judge.
 
 
 1
 Over the years the principal airlines in the United States have sought a solution to a congeries of controversies arising out of what is generally described as "the crew complement issue." Several phases of this controversy came to a head in the present case tried by Judge Wyatt. In the interest of brevity we may describe the parties as ALPA, the nationwide collective bargaining representative of the pilots, the Chapter, the collective bargaining representative of the flight engineers employed by American, and certain pilots of American who broke away from ALPA and finally formed a new organization, Allied Pilots Association. The action was commenced on March 1, 1963 by ALPA challenging the right of American to bargain with the new Allied Pilots Association. On March 12, 1963 the flight engineers intervened seeking declaratory relief, and, on March 21, 1963 they were permitted to amend their pleading so as to pray for the injunctive relief that is the subject matter of this appeal. The pilots are described in the title of the action as "Additional Defendants." The upshot was a decision by Judge Wyatt having a triple aspect: (1) a holding in substance that ALPA was out and that American was entitled to bargain and enter into a collective bargaining agreement with Allied Pilots Association, already affirmed by this Court in Ruby v. American Airlines, Inc., 2 Cir., 1963, 323 F.2d 248; (2) a holding that American must continue its checkoff of dues for the benefit of the flight engineers, affirmed by the opinion of my brother Friendly, writing for a unanimous court in an opinion filed herewith, Manning v. American Airlines, Inc., 2 Cir., 329 F.2d 32; and (3) a holding in effect requiring American to bargain with the Chapter with respect to rules, rates of pay and working conditions of the flight engineers, based upon a finding of persistent and long continued refusal to bargain, which is the subject matter of the bargaining appeal discussed in this opinion.
 
 
 2
 The lengthy opinion of Judge Wyatt, based upon a thorough mastery of the facts as disclosed in a voluminous record of thousands of pages of testimony, supplemented by numerous exhibits, is reported at 227 F.Supp. 674. We affirm in all respects the judgment appealed from requiring American to bargain with the flight engineers and granting certain incidental relief to make the injunction effective.
 
 
 3
 We shall assume familiarity with the "crew complement issue" and other matters described in Judge Friendly's opinion in the Ruby case.
 
 
 4
 The critical finding that lies at the heart of this appeal is:
 
 
 5
 "From at least as early as January 31, 1963 to July 11, 1963, the Company refused to bargain collectively with the Chapter, and until at least as late as March 15, 1963 the Company instead bargained collectively in respect of flight engineers only with a committee, of which O'Connell was Chairman, and which the Company claimed represented the flight engineers."
 
 
 6
 The principal difference between our views and those expressed in the dissent stems from the nature of this finding. We say this is a finding of pure, unadulterated fact, and that it cannot be disregarded or set aside unless clearly erroneous. We also hold that the questions of law, to be discussed in due course, stand out like sore thumbs, as indicated in Judge Wyatt's excellent opinion. That American refused to bargain is matter of fact. That it was under a legal duty to bargain is matter of law.[1]
 
 
 7
 As the matters of fact and the matters of law are thus clearly separated, we do not understand how the finding just quoted can be considered to be such an intermingling of fact and law as to give this Court any so-called power of "full review." See Romero v. Garcia & Diaz, Inc., 2 Cir., 1961, 286 F.2d 347; Castro v. Moore-McCormack Lines, Inc., 2 Cir., 1963, 325 F.2d 72.
 
 
 8
 If the power of "full review," otherwise expressed as the power to "review freely," exists in such a case as this, despite the clear separation of fact and law, the inevitable result will be lengthy opinions in which dribs and drabs of testimonial evidence, and quotations of excerpts from exhibits, will be scrambled together with bits of law into an indiscriminate mass, all for the purpose of supporting a conclusion deemed to be economically or socially wise or to be otherwise desirable. And in this hodgepodge reference will be "freely" made to testimony that the trial judge has necessarily rejected as not credible and to statements in documents that he has necessarily found to be unreliable. If true findings are only separate statements of "evidentiary" particulars, rather than the traditional conclusory statements of fact based upon a distillation of the proofs and the making of essential inferences of fact, the result will be a most undesirable confusion. So, at the outset we state the rule to be, especially in this case where the testimonial evidence is conflicting and the trial judge saw and heard the witnesses as they gave their testimony, that a finding of fact by a District Judge in a non-jury case must stand if there is substantial evidence to support it; and it must be assumed that conflicting testimony was rejected and that documents or parts thereof depending on the veracity of the witnesses giving such conflicting testimony were found to be unreliable, even if the trial judge does not make an endless series of detailed statements to the effect that he does not credit the testimony or part of the testimony of each witness.
 
 
 9
 Accordingly, we shall now address ourselves to a chronological statement of the course of events supplemented by comments and discussion, all for the purpose of demonstrating that the finding quoted above is supported by substantial evidence. In the process we think it will clearly appear that the proofs overwhelmingly support the finding. Some of the law questions will be adverted to briefly as we go along, and the decisive legal principles upon which the injunction is based will be summarized at the end.
 
 
 10
 * There Was Substantial Evidence to Support the Finding of a Persistent Refusal to Bargain Over a Period of Many Months
 
 
 11
 From May 25, 1955 the Flight Engineers' International Association (FEIA) had been certified by the National Mediation Board as the bargaining agent for the American flight engineers. While the existing contract effective May 1, 1958 did not expire according to its terms until April 30, 1963, one of its provisions permitted Section 6 "openers" to be served as affecting wages "to be effective not earlier than May 1, 1961." Accordingly, as the flight engineers insisted upon wage increases at the earliest possible date, the Chapter (i. e., the flight engineers) and American each served Section 6 "openers" in February, 1961, as affecting wage demands, as provided in the contract. There were negotiations on the subject of these wage increases from time to time between the flight engineers' team and the American negotiators, but progress was at a snail's pace. On March 14, 1962 the Chapter asked the National Mediation Board for mediation. The Board urged arbitration, the Chapter refused, and on June 21, 1962 the Board terminated its services, leaving the parties after the lapse of 30 days thereafter free from the restrictions of the Railway Labor Act.
 
 
 12
 Labor Department officials brought the flight engineers and American negotiators together in Washington, D. C., for meetings during the week of July 9, 1962. As found by Judge Wyatt, "The engineers were primarily interested in discussing wages at once," but American representatives "explained privately to the Labor Department officials that the problem on American was not so much with the engineers as with the pilots, this because the American pilots were far more interested in reduction of hours and other benefits (which would be very expensive for the Company) than in crew complement." Indeed, in May, 1962 the American pilots had informed American "that they were not interested in having the Company spend its money to qualify flight engineers * * * they wanted a reduction of hours and other benefits instead."
 
 
 13
 This in turn led to a series of developments that carry us right up to the threshold of the critical dates mentioned in Judge Wyatt's principal finding quoted above.
 
 
 14
 We are now in Washington, D. C., in July, 1962. Labor Department officials, Chairman Leverett Edwards of the National Mediation Board, the pilots and American negotiators worked steadily from July 16 until July 25, 1962. The flight engineers "played little part" in these meetings. The net result was a collision of policies between the American pilots, who wanted reduced hours, better retirement plan provisions and miscellaneous benefits and who were not interested in the crew complement issue, and Ruby who, as President of the national organization, desired a uniform policy to be applied equally to all the major airlines.
 
 
 15
 The scene now shifts from Washington, D. C., to Fort Worth, Texas, and the dates are July 31 to August 2, 1962. The American officials are there, also the American pilots and Chairman Edwards. The flight engineers were not there and the reason for this is that the pilots and the Company officials were seeking some way of solving the crew complement issue in a way satisfactory to ALPA. The upshot was a proposal by O'Connell, chairman of the Negotiating Committee for American pilots. This was called "O'Connell's iffy," and Judge Wyatt describes it as follows: "if the Company would grant them (the pilots) reduced hours and an improved retirement plan, they on their side would agree to a three man crew without insisting that the flight engineer have a `C and I' (thus saving the Company expensive training), and would bring the engineers not only into such an agreement but also into a merger with ALPA." There would thus be only one union in the cockpit and the Company, and the pilots would be happy and the integrity of ALPA maintained unimpaired. We shall see what was the reaction of the flight engineers.
 
 
 16
 In principle, the O'Connell proposal looked good to the engineers, provided they were to do the negotiating with respect to the increases in wages to be given to them. Everything went smoothly through September and October, 1962. On the basis that everything was tentative and conditional until the final agreement was made and assented to by all the parties, the Chapter agreed to the merger with ALPA, and agreed to give up its separate representation of the flight engineers for the future, so that after the merger wages for flight engineers would be negotiated by ALPA. But the flight engineers were wary. As soon as the negotiations got around to the subject of wages, the flight engineers pointed out that there were 1600 pilots and only 600 flight engineers, and they wanted something in the agreement prescribing "the minimum relationship between the two pay scales, so that there could be some standard for future negotiations." As this could not be agreed on, even tentatively, the matter was left with the understanding "that the Chapter negotiating committee would separately negotiate with American on engineer wages for the contract then to be made, and that the engineer wage thus negotiated would form the basis for the pay relationship with pilots to be inserted in the merger agreement."
 
 
 17
 The pilots and the flight engineers then met jointly with Company officials, beginning November 1, 1962. Both the pilots and the engineers submitted separate proposals to the Company. Everything looked rosy on December 1, 1962 when O'Connell for the pilots, Manning for the flight engineers and Whitacre for the Company initialed the tentative and conditional agreement.
 
 Judge Wyatt found:
 
 18
 "Nothing which was said or done in these joint negotiations justified the company in believing that the engineers had given up their representation rights to a `joint committee' or otherwise. It was clear that the giving up would only occur after a complete and overall agreement had been reached by all parties, which unfortunately never came to pass." (Emphasis that of Judge Wyatt.)
 
 
 19
 Before long it was apparent that Ruby would not go along for ALPA. By January 11, 1963 the American pilots and ALPA had parted company. The natural result of this was that the Company resumed negotiations with O'Connell's pilots' committee on January 16, 1963 and the flight engineers' negotiating committee joined the negotiation group on January 17, 1963.
 
 
 20
 As we now approach "at least as early as January 31, 1963," the time when Judge Wyatt found American commenced its refusal to bargain with the Chapter, it is well to bear in mind that the Chapter had throughout all these interesting developments steadfastly maintained its right separately to represent and to bargain for the flight engineers. More than this, it was especially on the alert, at all stages of the various negotiations, to preserve this right intact. The unresolved issue of additional wages for the flight engineers had at all times been in the forefront of the minds of the Chapter negotiators and they frequently expressed themselves clearly on the subject in their meetings and conferences with Company officials and also in their meetings and conferences with the pilots.
 
 
 21
 On January 24, 1963 O'Connell handed the flight engineers some substitute pages to be inserted in the tentative and conditional agreement of December 1, 1962. Blanks were placed instead of ALPA in these pages. This led to a dispute and the substitute pages were later withdrawn.
 
 
 22
 The upshot was an exchange of letters that precipitated the controversy on this bargaining appeal. Whitacre wrote to Ruby on January 28, 1963, and sent a copy to Schwartz, counsel for the Chapter. After a reference to the joint negotiations, the letter contained the statement, "Accordingly, the Company recognized a Joint Committee for the purpose of negotiating a single agreement covering all cockpit members." Schwartz became suspicious, and he replied on January 29, 1963, with the statement:
 
 
 23
 "Until the American Chapter, FEIA, merges with the ALPA, or any other representative of the Pilots, we remain a representative of a separate bargaining unit under the Railway Labor Act. There has never been a misunderstanding in this connection, and we do not want your letter of January 28, 1963 to create one."
 
 
 24
 Whitacre made no response to this letter from Schwartz, and it was soon all too evident that Schwartz' fears were well founded. On January 31, 1963 negotiations reached the subject of pay and retirement provisions for the flight engineers. The parties had been bargaining on this subject off and on, and it is our view that throughout this period and before the second series of "reopeners" served reciprocally on February 28, 1963, and hereafter referred to, American was under a continuing duty to bargain with the flight engineers on the subject of wages. We do not understand there to be any distinction between "wages" and "retroactive wages" or "future wages."[2]
 
 
 25
 In any event, we have now arrived at the point where the testimony is in conflict and Judge Wyatt was called upon to decide questions of veracity and credibility, not on the basis of depositions, but with the witnesses in full view testifying before him in open court. And it may be well to mention the fact, in passing, that company memoranda are not sacrosanct, especially when they contain, as they do here, a variety of contradictions.
 
 
 26
 O'Connell testified that during the January 31, 1963 meeting, "Mr. Whitacre indicated the desire to deal with the joint committee when he was referred to the wages of the flight engineers," and that "Mr. Manning, I believe, expressed the desire of the flight engineers to speak for themselves in regard to their own wages." Coming immediately after Whitacre's failure to respond to the letter from Schwartz of January 29, 1963, I do not see how Judge Wyatt could do otherwise than infer that the reason for the failure to respond to the letter was that American ignored it because it would not negotiate flight engineer wages directly with the flight engineers, which is what this case is about. His finding is:
 
 
 27
 "The Company took the position that on and after November 1 the pilots and engineers were already one and that the engineers for collective bargaining purposes were being represented by a `Joint Negotiating Committee', of which O'Connell was chairman or spokesman. Accordingly, the Company position on January 31 was that pay and retirement provisions for engineers were matters for negotiation with the `Joint Negotiating Committee' and not with the engineers' committee separately; the Company declined to negotiate with the engineers' committee separately." (Emphasis that of Judge Wyatt.)
 
 
 28
 Manning testified that, not only in Whitacre's letter of January 28, 1963, but on many other occasions after that date, the Company "was very firm in their position that they were dealing with a Joint Committee and that the Chairman of the Joint Committee was Mr. O'Connell, of the pilots' committee, and that they would only talk about our wages through Mr. O'Connell or through the Joint Committee." (Emphasis supplied.) The Company conducted itself in this fashion despite the fact that, according to Manning, throughout these talks "we told them we had never made any arrangement with Mr. O'Connell to speak for us. We told them we were speaking for the flight engineers and representing flight engineers on American Airlines and speaking for them in so far as flight engineer affairs were concerned." Manning also testified that the flight engineers never agreed to a Joint Committee and on the one occasion, on February 2, 1963, when they offered a proposal for flight engineer wages in the name of the Joint Committee, it was only because Mr. Schoonover, of the NMB, prevailed upon them to "follow the format of making a proposal in the name of the Joint Committee" because the flight engineers "were not getting anywhere with the Company in offering proposals as flight engineers."
 
 
 29
 E. C. Petree, a member of the Chapter Negotiating Committee, testified that on February 12, 1963 before the pilot committee and flight engineer committee met with the Company, the flight engineers asked pilot representative O'Connell "if he would mind carrying on the conversation for us since it was apparent that he could talk with Mr. Whitacre and we could not." Petree then described details of the meeting which illustrated how it was impossible for him to talk directly with Whitacre and how his communications with Whitacre concerning flight engineer wages had to be passed on via pilot O'Connell — even though Petree and Whitacre were sitting at the very same table.
 
 
 30
 Manning testified to similar experiences with Whitacre on February 13 and 14, 1963, and also to the fact that although the flight engineers reasserted their rights as a separate bargaining representative, the Company "said we had given them up to this Joint Committee and the Joint Committee was now doing the negotiating for the flight engineers." "Later on," according to Manning, "the Company represented to us that the only way they would talk to us about the [1961] wage reopener was through this Joint Committee."
 
 
 31
 Whitacre himself testified that on February 26, 1963, he told the flight engineers in words or substance that the flight engineers had agreed to the Company's proposal through the Joint Committee with Mr. O'Connell as their spokesman and that flight engineer "retroactive pay will have to be settled through the Joint Committee * * *." The Company maintained this posture despite the fact that the flight engineers never relinquished their representational rights to any Joint Committee.
 
 
 32
 It is against the background reflected in this testimony and the other facts stated in this chronological summary that American and the Chapter served new "reopeners" on February 28, 1963.
 
 
 33
 On March 6, 8 and 12, 1963, meetings between the Company and the flight engineers were held at the suggestion of Edwards. The Company, dubbing these meetings as "bull sessions," was careful to make clear that the talks were not bargaining sessions.
 
 
 34
 Petree testified that on March 8, 1963 "we attempted to talk wages, but Mr. Wisehart objected on our wage talks, and he claimed that this is not the Joint Committee, that he could not allow negotiations on that subject to proceed."
 
 
 35
 Manning also testified that "the Company took the position all the time that they would negotiate with us through the Joint Committee, and that was the only way they would negotiate with us * *." There is cumulative testimony to the effect that on March 6, 1963 Whitacre told Edwards that he "wouldn't yield on this joint committee concept and that he was not interested in proceeding with the flight engineers as an independent bargaining agent."
 
 
 36
 In the midst of this extraordinary episode of the "bull sessions," and on March 7, 1963 the Chapter notified American that it would not bargain through any Joint Committee, that it had not abandoned or released its rights as sole bargaining agent for the flight engineers and that it was prepared to meet with the Company "immediately." This was no precipitate action prompted by the commencement of this action on March 1, 1963 by Ruby and ALPA. It was the inevitable consequence of the attitude taken by American from the very date of Whitacre's letter of January 28, 1963. This attitude had crystallized into an adamant position at the first "bull session" on March 6, 1963. Moreover, once ALPA's action was commenced the flight engineers had no option other than to seek to intervene in order to continue to assert and to protect their rights.
 
 
 37
 To cap the climax, in the final arguments on August 6, 1963 there was the following colloquy between Judge Wyatt and Mr. Wisehart, counsel for American:
 
 
 38
 "The Court: Bull sessions, but you weren't bargaining with them, you wouldn't bargain with them.
 
 
 39
 "Mr. Wisehart: That's right, but they were discussing something which obviously had been a very recent development, namely, the decision of the engineers to apparently abandon their prior course of dealing.
 
 
 40
 "Now, I think in terms of the engineers' equities in this matter it is important to keep that time sequence in mind.
 
 
 41
 "The Court: I have it very much in mind."
 
 
 42
 In the meantime, as American must have realized that on this record Judge Wyatt had no alternative other than to find it had refused to bargain separately with the flight engineers on the subject of increases in the wages of the flight engineers and retroactive pay, American dispatched its belated and most significant letter of July 11, 1963, stating that American "is now prepared to resume bargaining with AAL Chapter FEIA." (Emphasis supplied.)
 
 II
 
 Comment and Discussion
 
 
 43
 Aside from the basic law governing the case, to be discussed hereafter, the record and the briefs disclose a number of miscellaneous law points relied upon by American that can be readily disposed of, as there is no merit in any of them.
 
 
 44
 American's principal contention before Judge Wyatt and in its briefs and argument in this Court was that by entering into the joint discussions in November, 1962 FEIA abandoned and relinquished its rights as a separate bargaining agent for the flight engineers, and that it was accordingly estopped to claim otherwise thereafter. This is referred to in the dissent as an insupportable claim, and we agree. The Chapter had a legal right to be the sole bargaining agent for the flight engineers. This right they never surrendered. Indeed, they fought consistently and tenaciously to maintain this right.
 
 
 45
 There was no change in the legal status of the parties after the exchange of the second series of "reopeners" in February, 1963 or after the commencement of the action in March, 1963. Indeed, after March 1, 1963 American acted even more contemptuously toward the Chapter and its asserted right to be treated as the sole bargaining representative of the flight engineers.
 
 
 46
 Late in March, Stepard, the FEIA Secretary-Treasurer, phoned Lamond of American and left word that "the American Committee of Flight Engineers was ready to talk wages." Lamond paid no attention to this. Lamond's testimony that toward the end of the week of March 18 he authorized Chairman Edwards to tell Schwartz that he would meet with the engineers' committee as soon as his schedule of court engagements would permit is wholly discredited by the record as a whole and the inherent improbability that he made any such statement. Judge Wyatt was quite justified in disregarding it. The notion that Lamond, with American's staff of lawyers at his beck and call, was too busy taking or giving depositions and supervising "operations" to respond to Stepard's message was too far-fetched to be credited by Judge Wyatt. But there is more to come.
 
 
 47
 Instead of "talking wages" with the flight engineers, the Company felt so confident of the ultimate result that it even bargained separately with the pilots over the wages to be paid to the flight engineers in the new set-up. This is evidenced by the March 15, 1963 "basic working agreement" (Intervenors' Exhibit 46), which, as Judge Wyatt said, "covered both pilots and engineers, as to compensation and everything else." Then the new Allied Pilots Association was formed and ALPA was finally and irrevocably out, unless the Supreme Court should reverse our holding in Ruby v. American Airlines, Inc., supra, 2 Cir., 1963, 323 F.2d 248.
 
 
 48
 The sequel, as described by Judge Wyatt in his opinion, was:
 
 
 49
 "Under date of March 28, Whitacre wrote to O'Connell confirming certain understandings as to the rates of pay and retirement benefits for engineers and adding that as to retroactive pay for engineers the Company `stands ready to meet with the Joint Committee'; apparently neither this letter nor the March 15 agreements were given to any of the engineer representatives."
 
 
 50
 An agreement between the Company and the new Allied Pilots Association was duly executed. This new collective bargaining agreement made no reference to the understandings already had between the pilots and the Company "as to the rates of pay and retirement benefits for engineers," or "retroactive pay for engineers." Instead, the Company unctuously informs the flight engineers that their rights will in no way be jeopardized. And the crowning glory is the Company's final statement in its letter to Manning of July 11, 1963, after the Company had attained its principal objectives and though the flight engineers were at its mercy — the Company "is now prepared to resume bargaining" with the Chapter. In the meantime, after the ouster of ALPA, American twice urged Judge Wyatt to dismiss the claims of the flight engineers as moot.
 
 
 51
 The bargaining rights of the Chapter have been persistently infringed, and the Company even went so far as to maintain throughout that the Chapter had no such rights. American should not be permitted to get off unscathed, under these circumstances, by a pious offer to bargain after ALPA was out, after the basic working agreement had been negotiated and after the Company's maneuvers had been so fully exposed as to make it probable that the case was irretrievably lost.
 
 III
 
 The Law
 
 
 52
 The basic law controlling this case is simplicity itself. The Railway Labor Act, 45 U.S.C. § 151 et seq., as amended, requires an employer to bargain collectively with the duly certified representative of its employees on the subjects of "rates of pay, rules, and working conditions." See 45 U.S.C. § 152 First, Second, Fourth, and Ninth; Virginian Ry. Co. v. System Federation No. 40, 1937, 300 U.S. 515, 542-549, 57 S.Ct. 592, 81 L.Ed. 789; Brotherhood of Railroad Trainmen v. Toledo, P. & W. R., 1944, 321 U.S. 50, 61, 64 S.Ct. 413, 88 L.Ed. 534; International Association of Machinists v. Central Airlines, Inc., 1963, 372 U.S. 682, 690, 83 S.Ct. 956, 10 L.Ed. 2d 67.
 
 
 53
 This naturally means bargaining with the collective bargaining representative and not bargaining with anyone else who does not represent those on whose behalf the certification has been made. Thus the Supreme Court in the Virginian Railway case, supra, 300 U.S. at page 548, 57 S.Ct. at page 599, 81 L.Ed. 789, held:
 
 
 54
 "Both the statute and the decree are aimed at securing settlement of labor disputes by inducing collective bargaining with the true representative of the employees and by preventing such bargaining with any who do not represent them. The obligation imposed on the employer by § 2, Ninth, to treat with the true representative of the employees as designated by the Mediation Board, when read in the light of the declared purposes of the Act, and of the provisions of § 2, Third and Fourth, giving to the employees the right to organize and bargain collectively through the representative of their own selection, is exclusive. It imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other." (Emphasis supplied.)
 
 
 55
 Nor can these principles be affected by the pendency of a lawsuit. The cry "they sued us" has a hollow ring. It was ALPA which commenced the lawsuit and intervention by the Chapter was a necessary step to protect the rights of the flight engineers. It would be strange indeed if an effort to protect one's rights should be construed as giving immunity to the aggressor. Besides, as the central, basic finding of Judge Wyatt demonstrates, there had been an adamant and persistent refusal to bargain in January, February, March, April, May and June of 1963. It is futile to try to cut this up into segments and treat it piecemeal. American was under a duty to bargain with the Chapter on the subject of the wages of the flight engineers prior to the service of the second series of "reopeners," and American did bargain on this subject, off and on, up to "at least as early as January 31, 1963," when American changed its position. American was also under a duty to bargain after the service of the second series of "reopeners," after the commencement of the lawsuit and thereafter during the entire period. It was a continuing course of conduct and must be treated as such. Indeed, this would be true even if the bargaining by American prior to the service of the second series of "reopeners" had been voluntary and not under the compulsion of the law.
 
 
 56
 How the issuance of the type of injunction authorized by the Virginian Railway case, supra, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789, could be held to be an abuse of discretion is beyond our understanding. There is nothing "debatable" or doubtful about the case made out by the Chapter.
 
 
 57
 If, after such a prolonged and persistent refusal to bargain, a great airline can thumb its nose to a comparatively small labor organization, and hide its flouting of the law behind a final surrender to the effect that "now" it is ready to bargain, at so late a date as July 11, 1963, the Railway Labor Act becomes a mockery and a dead letter. This is a power play from first to last.
 
 
 58
 It is clear, at least, that the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., as amended, does not bar absolutely the use of the injunctive power of the federal courts in labor disputes. See, e. g., Brotherhood of Railroad Trainmen v. Chicago R. & I. R. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622; Brotherhood of Railroad Trainmen v. Howard, 1952, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283; Virginian Ry. Co. v. System Federation No. 40, supra, 1937, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789.
 
 
 59
 In order to determine whether the Norris-LaGuardia Act prohibits a federal court from issuing an injunction in this particular case, we must be guided by the principle laid down in Brotherhood of Railroad Trainmen v. Chicago R. & I. R. Co., supra, 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622. In that case, while deciding that a federal court may enjoin a labor organization from resorting to a strike over matters pending before the Adjustment Board, the Supreme Court, 353 U.S. at page 40, 77 S.Ct. at page 640, 1 L.Ed.2d 622, said:
 
 
 60
 "We hold that the Norris-La Guardia Act cannot be read alone in matters dealing with railway labor disputes. There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved. We think that the purposes of these Acts are reconcilable."
 
 
 61
 See Note (1958) 72 Harv.L.Rev. 354, 354-357, 360-364, 371.
 
 
 62
 The purpose of the Norris-LaGuardia Act is to restrain the federal courts from using their injunctive power, especially against labor in the form of strike breaking, to influence the outcome of labor disputes and, in accord with the aims of both the Railway Labor Act and the National Labor Relations Act, the Act expresses the intent of the Congress that labor disputes be resolved through collective bargaining. See 29 U.S.C. § 102 (declaration of underlying policy of the Act); Brotherhood of Railroad Trainmen v. Toledo, P. & W. R. Co., supra, 1944, 321 U.S. 50, 58-59, 64 S.Ct. 413, 88 L.Ed. 534; Brotherhood of Railroad Trainmen v. Chicago R. & I. R. Co., supra, 1957, 353 U.S. 30, 40-41, 77 S.Ct. 635, 1 L.Ed.2d 622; 75 Cong.Rec. 4505-4510, 4618-4626, 5462-5515 (1932); S. Rep. No. 163, 72d Cong., 1st Sess. 7-12 (1932); H.R.Rep. No. 669, 72d Cong., 1st Sess. 3 (1932).
 
 
 63
 Thus an injunction commanding an employer to bargain with the duly certified bargaining representative of its employees can hardly violate either the Norris-LaGuardia Act or basic federal policy in the area of labor management relations. Where, as in this case, the refusal to bargain is long continued and persistent and is clearly established by the proofs, the courts should grant relief by way of injunction. Virginian Ry. Co. v. System Federation No. 40, supra, 1937, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; see Brotherhood of Railroad Trainmen v. Toledo, P. & W. R., supra, 1944, 321 U.S. 50, 61-62, 64 S.Ct. 413, 88 L.Ed. 534. In the context of this case, where the NMB, in the Spring of 1962, recognized that mediation of the wage dispute was unsuccessful and the District Court, supported by the preponderance of the evidence, found as a matter of fact that the Company refused to bargain from at least as early as January 31, 1963 until July 11, 1963, the injunction of Judge Wyatt, limited in its objective, was clearly called for.
 
 
 64
 Judge Wyatt was also justified in enjoining the pilot representatives from (1) bargaining with the Company concerning the rules, rates of pay and working conditions of the flight engineers, (2) making, publishing or implementing any agreement covering the rules, rates of pay or working conditions of the flight engineers or (3) interfering with, influencing or coercing the flight engineers with respect to their right freely to choose their bargaining representatives. The record and findings below support the reasonableness and necessity of these orders for the complete and effective relief to which the flight engineers are entitled. Cf. Local 167, etc. v. United States, 1934, 291 U.S. 293, 299, 54 S.Ct. 396, 78 L.Ed. 804; Porter v. Warner Holding Co., 1946, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332.
 
 
 65
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 It is quite true, as held in some of the cases cited in the dissent, that we often deal with "findings" that are no more than legal conclusions, in which event the "finding" is "freely reviewable" on appeal, because it is impossible to separate the "law" from the "fact" in the finding. The principle involved is a simple one, although not always easy to apply. It is our function to review the law. It is not our function to review the facts, except when a finding of fact by the trial judge is clearly erroneous. True findings of fact on conflicting evidence are not to be disturbed by us even if we as individual judges would have made different findings had we presided over the trial
 
 
 [2]
 American had a duty to bargain and confer with the authorized representative of the flight engineers not only in regard to the subjects raised in the "openers" that had previously been exchanged, but also in regard to "all disputes" in which the flight engineers were "interested" — including, of course, the disputes relating to crew complement and possible merger of the flight engineer and pilot unions. 45 U.S.C. § 152 Second. In exerting pressure on the flight engineers to negotiate through a Joint Committee headed by pilot O'Connell — as the dissent concedes was done — the Company was not only refusing to bargain but was violating Section 2 Third of the Railway Labor Act, 45 U.S.C. § 152 Third, which provides that "neither party shallin any way interfere with, influence, or coerce the other in its choice of representatives." (Emphasis supplied.) The stress put by the dissent upon Section 2 Ninth of the Railway Labor Act, 45 U.S.C. § 152 Ninth, seems to be misplaced as the controversy with which we are here concerned was not, in the language of that paragraph, a dispute "among a carrier's employees as to who are the representatives of such employees." The Chapter was the certified bargaining representative of the flight engineers. O'Connell did not purport to represent the flight engineers. Manning did not purport to represent the pilots.
 
 
 
 66
 FRIENDLY, Circuit Judge (dissenting).
 
 
 67
 If affirmance here merely perpetuated a useless but harmless injunction directing American Airlines to do what it already was doing voluntarily, a mere notation of dissent would suffice. I am impelled to do more because the course adopted by my brothers misconceives and avoids the responsibility of appellate review by wrongly baptizing as a finding of fact — largely immune from our scrutiny — conclusions of the trial judge which it is our duty to reexamine; and further because it makes the federal courts a second ring for airline and railroad bargaining disputes in contravention of the statutory plan, and flouts the command of the Norris-La Guardia Act.
 
 
 68
 (1) For convenience I quote again what the majority characterizes as "The critical finding that lies at the heart of this appeal":
 
 
 69
 "From at least as early as January 31, 1963 to July 11, 1963, the Company refused to bargain collectively with the Chapter, and until at least as late as March 15, 1963 the Company instead bargained collectively in respect of flight engineers only with a committee, of which O'Connell was Chairman, and which the Company claimed represented the flight engineers."
 
 
 70
 My brother Medina certifies this to be "a finding of pure, unadulterated fact." To me the only part that would clearly qualify for this certicate is the recitation that during the period from January 31 to March 15 the Company bargained only with the committee of which O'Connell was chairman — a finding which is factually correct but legally inconclusive. Although one could debate whether the final clause, using the word "represented," is a finding of "pure" fact or a legal characterization or both, there is no need to do so; if "represented" means only that the engineers were to make themselves heard in meetings held jointly with the pilots, it is right but inconclusive, whereas if it means that the committee, acting as such, could bind the engineers, it is clearly erroneous. The much emphasized initial statement of a refusal to bargain collectively, a term having legal content and consequences, is no more a finding of "pure" fact than are findings of invention, Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153-154, 71 S.Ct. 127, 95 L.Ed. 162 (1950), of negligence or unseaworthiness, Romero v. Garcia & Diaz, Inc., 286 F.2d 347, 355 (2 Cir.), cert. denied, 365 U.S. 869, 81 S.Ct. 905, 5 L.Ed.2d 860 (1961), and cases there cited, particularly the discussion by Judge L. Hand in Barbarino v. Stanhope S.S. Co., 151 F.2d 553, 555 (2 Cir. 1945); Van Carpals v. S.S. American Harvester, 297 F.2d 9 (2 Cir. 1961), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 84 (1962), or of reasonable diligence, Dale v. Rosenfeld, 229 F.2d 855, 858 (2 Cir. 1956). See also Baumgartner v. United States, 322 U.S. 665, 670-671, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944); Dalehite v. United States, 346 U.S. 15, 24 fn. 8, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); United States v. Parke, Davis & Co., 362 U.S. 29, 44, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); and Lehmann v. Acheson, 206 F.2d 592, 594 (3 Cir. 1953).
 
 
 71
 A judge's conclusion that a party refused to bargain in violation of its duty is the result of two previous steps. One is his finding of the facts as to what happened; another is his formulation of a legal standard or, more exactly, his identification of the types of facts which must be found to permit the conclusion of a violation of duty. Thus one party may well have "refused to bargain" in the precise manner or at the precise time and place upon which the other insists. Whether or not such conduct would constitute an illegal refusal depends on the formulation of a standard defining the obligation to bargain and not merely on a factual finding that on a certain day he said, "I refuse to do thus and so." The Supreme Court has recognized this distinction in the review of orders under §§ 8(a) (5) and (b) (3) of the National Labor Relations Act; although the Labor Board's findings of evidentiary facts and the factual inferences drawn therefrom are "findings * * * with respect to questions of fact" which §§ 10(e) and (f) make conclusive "if supported by substantial evidence on the record considered as a whole," the ultimate conclusion that, on such facts and the inferences therefrom, an employer or a union has refused to bargain in violation of its legal duty has been deemed open to full review. N. L. R. B. v. American Nat'l Ins. Co., 343 U.S. 395, 409-410, 72 S.Ct. 824, 96 L.Ed. 1027 (1952); N. L. R. B. v. Insurance Agents' Int'l Union, 361 U.S. 477, 499-500, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). Yet the scope of review over action by a district judge under the "not clearly erroneous" rule is wider than as to administrative orders. See District of Columbia v. Pace, 320 U.S. 698, 64 S.Ct. 406, 88 L.Ed. 408 (1944), and the discussion in Stern, Review of Findings of Administrators, Judges and Juries: a Comparative Analysis, 58 Harv.L.Rev. 70, 79-89 (1944).
 
 
 72
 Calling a judge's legal conclusion a finding of fact is an all too easy way for appellate judges to obscure or even avoid legal issues when the result of the trial suits them. The important legal issue here, which my brothers neglect, is whether the Railway Labor Act prohibits an employer who faces the demands of two employee groups that call for a joint solution from insisting that the negotiations be held simultaneously in one room and across one table, and requires him instead to negotiate across two tables in two separate rooms, running back and forth from one to the other. When we strip off the plethora of words generated in weeks of negotiation and months of litigation, that is what this case is all about.
 
 
 73
 I find nothing in the Railway Labor Act that requires a result so contrary to good sense.[1] Neither, apparently, did the National Mediation Board, whose representatives attended all the joint committee sessions without demur. And neither did the Chapter which had gone along with the joint committee procedure until the bringing of the Ruby action led to its record-making letter of March 7 and its joining the judicial fray.
 
 
 74
 It is just as plain that American could not lawfully consider the committee as such the bargaining agent, either for the pilots or for the engineers. It never sought to do so.[2] But if ever there was a problem warranting an employer in demanding joint bargaining with two employee groups, this was it. Everyone had recognized from the outset that what American could and would offer its flight engineers depended on whether it could persuade its pilots to withdraw their demand for three cockpit positions for themselves and to accept an engineer for the third. The Chapter had a vital interest in a negotiating framework that would afford the best chance to accomplish this. The first fruit of the joint negotiation, the Memorandum of Agreement of December 1, 1962, providing that the third seat in the cockpit should be filled by a "Flight Officer," with the engineers entitled to priority for that post, was an achievement for the Chapter as well as for American. Yet, as everyone knew, this plan could become effective only as part of a complete agreement on salaries and working conditions for both groups. There was nothing wrong in American's insisting that the negotiations for this should take place in the same room. Although, as Judge Wyatt found and the majority repeats, the two groups had agreed in October that each should negotiate its own initial salaries, an agreement from which neither deviated, they were concerned not only with the absolute amounts but with the relationship. Beyond this the pilots had a direct interest in many matters being discussed with the engineers. They too might serve as "flight officers" subject to the engineers' seniority rights; all new hirings for the third cockpit position were to have pilot qualifications; the proposed merged union was to speak for the "flight officers" in future negotiations; and one of the topics for negotiation was whether the engineers were to come into the pilots' pension plan and, if so, on what terms. If the engineers wished, as they unquestionably did, to negotiate on a basis involving concessions by the pilots and integration in a single group with them, American was not required to bargain separately rather than together.
 
 
 75
 The relevant part of the story here begins with a completely harmonious joint negotiation in November, 1962, leading up to the December 1 Memorandum initialed by the three parties. This showed exactly how everyone intended matters to proceed. The final outcome was to be a single agreement covering all cockpit personnel, which would indeed be signed by a representative of the merged group, presumably O'Connell. But no such signing would occur until the Chapter had actually executed the Memorandum, along with ALPA and American, in the places provided to that end.
 
 
 76
 With this background it was by no means unnatural that O'Connell, the prospective future head of the merged group, should occasionally have been the mouthpiece for proposals for the engineers formulated by the Chapter. Sometimes the parties proceeded in one way, sometimes in another. Thus, on January 31 the Chapter itself submitted a modified wage proposal. Two days later, it submitted one beginning "The Joint Committee representing the cockpit crew members in the current negotiations to settle the crew complement issue on American Airlines make the following counter-proposal based on the assumption that they are merging with the Pilots in an overall settlement of the crew complement issue." When this was rejected, the Chapter submitted another proposal on February 6, beginning "The Flight Officers make the following proposal * * *." Since the Chapter's negotiators were unavoidably absent on February 11, this afforded an ideal opportunity for American to deal behind their backs if it had any thought of doing that. Instead American's contemporaneous notes recite that Schoonover, a representative of the NMB, "presented the Company with the Engineers' latest proposal * * *. Company registered objections to continued discussion with the Engineers absent and not due until Wed." "WBW [Whitacre] suggested we might be attempting too much. Perhaps we should just work an agreement with the pilots to drop the Second Officer and sign separately with the Engineers for what they can get. Lyons [a pilot] suggested that in Engineers' absence, we might work on open sections. WBW not agreeable. Prefers to call the Engineers in and button up the wage deal so the Company will have an idea of its costs * * *. O'Connell agreed F/E's should come in. Schoonover called Schwartz to arrange, couldn't reach. Contacted Manning who agreed to have his committee in by 10 A.M. tomorrow." On February 12 O'Connell again spoke for the engineers; the full text of Petree's testimony as to this episode gives a quite different impression from the summary in the majority opinion. Whitacre testified that he had at least one session with the flight engineer committee alone, as the notes of February 5 show; that the Company made a flight engineer pay proposal to the full committee on February 13; that O'Connell then acted as the flight engineers' spokesman; and that the discussion was resumed in full committee on the following day.
 
 
 77
 The majority cite not one word of evidence that O'Connell ever advanced any proposal affecting the engineers' salaries or working conditions save at their request or that he attempted to bind them to anything without their assent. Indeed my brothers concede, fn. 2, "O'Connell did not purport to represent the flight engineers," and Manning's own testimony, also cited, was "that they [American] would only talk about our wages through Mr. O'Connell or through the Joint Committee." (Emphasis supplied.) When Whitacre told the engineers on February 26 that he considered they had agreed to a pay proposal through the Joint Committee, there is no reason to doubt the sincerity of his belief that they had.[3] Moreover, the very nature of the Joint Committee precluded its acting as such. It had no formal constitution and its composition varied from day to day. On February 5 only the engineers attended, on February 11 only the pilots. Usually more pilot than engineer representatives were present, but there is no suggestion that the Chapter could not have sent more — or that this would have had any consequences, one way or the other. After the split between ALPA and the American pilot group, American made no attempt to sign with what remained of the committee as representing the pilots; it awaited the formation of Allied and action by the NMB under § 2 Ninth. It defies common sense to think it ever expected that either the whole committee or the rump could bind the engineers.[4]
 
 
 78
 We are now in a position to analyze the judge's "critical finding" that "From at least as early as January 31, 1963" American refused to bargain. This being a mixture of law and fact, one cannot be sure whether he thought American had violated a legal duty by insisting on joint bargaining or that it had done something more. If the former, his conclusion was wrong as a matter of law; if the latter, it would be "clearly erroneous" as a matter of fact. An appellate court need not hesitate to say this when, as here, despite my brothers' repeated suggestions of unspecified issues of credibility, the only real question is the characterization of what was admittedly said and done. E. F. Drew & Co. v. Reinhard, 170 F.2d 679, 683-684 (2 Cir. 1948); Orvis v. Higgins, 180 F.2d 537 (2 Cir.), cert. denied, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950). The standard in reviewing the judgment of a judge is not at all like that in reviewing a verdict or the conclusions of an administrative agency. In the classical formulation, "A finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). And the error, whether it be called of law or of fact, in the judge's conclusion that American violated its duty in the period between January 31 and February 28 when the joint committee sessions were proceeding vitiates his conclusions with respect to subsequent periods.
 
 
 79
 American's opener of February 28 stated that "In accordance with the current negotiations with the Joint Committee of pilot and flight engineer representatives" on the crew complement agreement, the company made various proposals as to the third cockpit position and also that "Cockpit crew members on all aircraft will be consolidated into one craft or class covered by a single basic agreement." It "suggested" — not the strongest verb in the English language — "that bargaining on the above proposals continue under the auspices of the Joint Committee and Mr. Leverett Edwards, Chairman of the National Mediation Board." This was surely a strange proposal to be made by the brazen violator of the Railway Labor Act depicted by the majority — criminals generally do not solicit the presence of the cop. On March 1 the complaint in the Ruby action against American was served; if ALPA prevailed in that action, any possibility of a settlement dispensing with the C and I requirement for the third cockpit position would vanish. On March 5 representatives of the engineers met with Chairman Edwards of the NMB to discuss the effect of the action on the negotiations. He is reported to have said that "he thought that was real good, that he thought it was fine that we all go to the court and find out just who represented who around here. In other words, he said we should have a ruling on who the bargaining agents legally are."[5] He also "suggested that we just stop negotiations until this ruling was made." There is double hearsay testimony as to Edwards' having said on the following day that he had talked with Whitacre who "wouldn't yield on this joint committee concept and that he was not interested in proceeding with the Flight Engineers as an independent bargaining agent." Edwards "suggested that we [the engineers] try meeting with the company, and if the company didn't want to call it a negotiating session, we just call it a bull session, but at least get with the company and try to carry on some talks." Such "bull sessions" were held on March 6, 8 and 12, in Edwards' presence; as the District Court found, "although many ideas were exchanged, nothing was settled."
 
 
 80
 This was the setting when, on March 7, Manning sent the company a letter, rather obviously intended for litigating purposes, which accused American of having insisted "on using the so-called `Joint Committee' approach to deprive our Committee of its rights to an independent voice in the determination of Flight Engineer wages" and of an "intention to sign an agreement with the Pilots affecting Flight Engineers through this device." The Chapter therefore refused to go along with the suggestion in American's opener for continuing negotiations through the joint committee, although it wished not merely "to settle on wages" but "to arrive at a settlement encompassing all issues which relate to a satisfactory crew complement agreement and a basic working agreement," and had "no objection to the presence of Pilot representatives." The accusations as to American's past conduct were unwarranted. American had not insisted on negotiating through a joint committee unless the engineers wished the benefit of a settlement whereby the pilots abandoned their claim to the third cockpit position, a plan which at the time involved a merger of the two groups; it had not suggested that the committee as such, or anyone other than the Chapter's representatives on the Committee, could settle the engineers' wages; and it had never intended to sign "an agreement with the Pilots affecting Flight Engineers" unless the engineers had become "pilots" by the Chapter's actually signing the December 1 Memorandum of Agreement. Before there was a fair opportunity to resolve the quiddities between continued negotiation through the "Joint Committee" and an altered form of negotiation with the engineers in the presence of pilots (and presumably another negotiation with the pilots in the presence of engineers), in the new situation created by the reopeners and the tense atmosphere generated by ALPA's request for an injunction against American's having any dealings with its own pilots, the Chapter moved on March 12 for leave to intervene and file a complaint in the Ruby action, annexing its March 7 letter as a supporting exhibit.
 
 
 81
 There was no occasion for the Chapter's thus rushing to the court house. A conclusion in the Ruby suit favorable to the plaintiff would have had the result of eliminating the joint committee, whereas the opposite one would have left matters as they were. It may be conceded that if litigation by the Chapter was necessary, it was convenient to have this in the Ruby action; but there was no emergency requiring it to take immediate resort to the courts rather than to explore the possibilities of some mutually acceptable form of negotiation after the dust raised by the bringing of the Ruby action had settled.
 
 
 82
 Apart from the fact that, as I should suppose, the validity of the Chapter's complaint must be tested by the circumstances existing when it was filed, I see nothing in subsequent developments to warrant American's condemnation. A party whose conduct has, on its reasonable view, been unreasonably challenged in court, need not exert itself unduly for the benefit of the challenger while the litigation is pending. Stepard's telephone call to Lamond did not alter the Chapter's position that although it wanted a complete settlement, it declined a joint negotiation to that end; in any event I see no reason to think Judge Wyatt discredited Lamond's unchallenged testimony that he authorized Chairman Edwards to tell Schwartz he would meet with the engineers' committee as soon as permitted by his active schedule of court engagements — his deposition, which stretches over hundreds of pages, was taken on March 18, 20, 22 and 26, and on March 19 all parties met with Chairman Edwards and with Mr. George Meany, President of the AFL-CIO. Likewise I see nothing sinister in American's giving O'Connell copies of the proposed single agreement at the point this had reached when the Chapter broke off negotiations, with the rates of pay for "flight officers" filled in with the figures which American believed to have been substantially agreed by the engineers' representatives on the Joint Committee. The law does not prohibit an employer's telling employees where negotiations stood when an impasse has been reached. N. L. R. B. v. Norfolk Shipbuilding & Drydock Corp., 195 F.2d 632, 637 (4 Cir. 1952); N. L. R. B. v. Superior Fireproof Door & Sash Co., 289 F.2d 713, 720 (2 Cir. 1961). O'Connell's testimony was that he intended to explain the documents, "after which some type of balloting will be established" for the men to "express themselves" and that he did not know "how it will be determined whether or not the flight engineers desire to join with the pilots in that organization"; if any such balloting were ever to occur, it would have had to be done under the supervision of the NMB pursuant to § 2 Ninth of the Railway Labor Act. Least of all do I comprehend my brothers' ire over American's conduct in July. They complain that the contract between American and Allied made no reference to the pay of the engineers, although they might well have cause for complaint if it had, as they also seem to charge. What American did obtain from its pilots was an agreement for conversion from a four-man to a three-man jet crew consistent with the December 1 Memorandum of Agreement that Manning had initialed, and a letter from Allied protecting the rights of the engineers to the third seat, which I quote in the margin.[6] It was precisely because this important matter of the crew complement had now been settled, not in conflict with the desires of the engineers but exactly in accord with them, that American no longer felt obliged to insist on joint bargaining and immediately advised that it would resume with the Chapter alone — peculiar conduct for a company which allegedly was using strong-arm tactics and, for reasons not explained by the majority, now "thought the flight engineers were at its mercy."
 
 
 83
 (2) Affirmance here is an invitation to parties in airline or railroad bargaining disputes to take to the courts controversies as to which Congress directed that resolution should be sought under the supervision of the NMB.
 
 
 84
 The cases in which judicial intervention under the Railway Labor Act has been deemed proper despite the absence of express provision to that end fall into several categories. There are the cases, of which Texas & N. O. R. R. v. Brotherhood of Ry. Clerks, 281 U.S. 548, 565-566, 50 S.Ct. 427, 74 L.Ed. 1034 (1930), is the progenitor, involving specific and then unique directives for maintaining the status quo in a labor dispute. See Chicago, R. I. & P. R. R. v. Switchmen's Union, 292 F.2d 61, 66 (2 Cir. 1961), cert. denied, 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806 (1962). There are the decisions, stemming from Steele v. Louisville & N. R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), and Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944), which concern racial discrimination by bargaining representatives, and those relating to the use of union funds for political purposes. International Ass'n of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). There is the principle that a court may forbid either party's violating the provisions for compulsory arbitration of a "minor dispute." Brotherhood of Railroad Trainmen v. Chicago River & I. R. R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Brotherhood of Locomotive Engineers v. Louisville & N. R. R., 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963). These lines of authority afford no support for intervention here, since none involves the courts in the intricacies of labor-management disputes. The only Supreme Court precedent in any way relevant is thus Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937).
 
 
 85
 When the facts in the Virginian case are analyzed, the difference between it and the instant case, even on the unfavorable view of American's conduct taken by the majority, outweigh the similarities. There the district court had found, 11 F.Supp. 621, 624-627 (E.D. Va.1935), and had been sustained by the Court of Appeals in finding, 84 F.2d 641, 643 (4 Cir. 1936), continued refusal by the railroad to confer in any way with a union certified by the NMB after an election in which it had been strenuously opposed by the railroad, and active sponsorship both to the defeated union and to a new one later organized. See also 300 U.S. 539-542, 57 S.Ct. 595, 81 L.Ed. 789. The NMB had done everything it possibly could; unless an injunction issued, the processes of the Railway Labor Act would have been stopped before having a chance to operate. Here American and the Chapter were engaging in a semantic quibble. Everyone agreed that the pilots and the engineers ultimately must be brought into line in some way; American, on the worst possible view, wanted to bargain with a joint committee "representing" pilots and engineers, whereas the Chapter wanted to bargain for the engineers separately but with the pilots present. Assuming, contrary to my belief, that the Chapter could properly insist on this, the gap was scarcely so wide that all possibility of the NMB's bridging it by mediation pursuant to § 5 First was a priori excluded. Yet the Chapter invoked the judicial process twelve days after exchange of the 1963 openers, before any of the machinery provided in the Railway Labor Act had a fair chance to operate. Judicial refusal to entertain such a complaint would by no means leave the plaintiff without remedy, as it would have in the Virginian Ry. case; any serious assertion by American that some other entity could bind the flight engineers would have led ultimately to action by the NMB under § 2 Ninth in which the legality of American's previous conduct would be investigated.
 
 
 86
 Courts are ill equipped to assist in solving controversies like this; I cannot help thinking that the diversion of the energies of the parties incident to compiling this enormous record, with 21 days of depositions or hearings, more than 3600 pages of depositions and trial transcript and hundreds of exhibits, in which every nuance of the negotiations was explored in tiresome detail, and the attending exacerbations, have postponed rather than expedited a solution of the engineers' problems — not to speak of the drain on the time of an over-burdened district court. The net result of all this activity has been the dismissal of ALPA's complaint[7] and an order requiring American to treat with the Chapter as it was then doing, and had been willing to do in a joint negotiation when the Chapter went to court. Meanwhile, save for whatever progress may have been made as a result of American's action of July 11, 1963, the processes of negotiation and mediation contemplated by §§ 2 First and Second, 5 and 6 of the Railway Labor Act have been at a standstill.
 
 
 87
 This picture does not square with my concept of the limited role of the courts in airline or railroad labor disputes, where Congress has chosen to rely so heavily on negotiation and mediation rather than on adversary proceedings. In other kinds of commerce as to which Congress has been far more prone to depend on the adversary process, see Ruby v. American Airlines, supra, 323 F.2d at 254, a complaint like the Chapter's would take the form of a charge to the National Labor Relations Board; it would be processed only if administrative screening showed it to have probable merit; and it would come before the courts in advance of agency decision only in the rare case where suit was brought by the Board under § 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j).[8] As the Supreme Court said in General Committee, etc. v. Missouri-K.-T. R. R., 320 U.S. 323, 333, 64 S.Ct. 146, 151, 88 L.Ed. 76 (1943), in a slightly different context, "The inference is strong that Congress intended to go no further" to involve the courts in such matters "than the express provisions of the [Railway Labor] Act indicate." When a complaint claims only a violation of the general duties imposed on labor and management by the first six paragraphs of § 2 of the Railway Labor Act, a court ought to make sure that a plaintiff's resort to the judicial arena will advance rather than hinder the purposes of the Act. Before it proceeds with the case it should demand a preliminary showing of a serious violation not susceptible of resolution through the machinery of the Act, and should require that showing to be made good before it grants a judgment. See also Ruby v. American Airlines, Inc., supra, 323 F.2d at 254-256.
 
 
 88
 (3) When an injunction is sought, judicial restraint is called for not only by the scheme and structure of the Railway Labor Act but by the Norris-La Guardia Act as well, 29 U.S.C. §§ 101-115. It is true enough that, as said in the Virginian Ry. case, 300 U.S. at 563, 57 S.Ct. at 607, 81 L.Ed. 789, the provisions of the Railway Labor Act "cannot be rendered nugatory by the earlier and more general provisions of the Norris-La Guardia Act," and also "that the Norris-La Guardia Act cannot be read alone in matters dealing with railway labor disputes." Brotherhood of Railroad Trainmen v. Chicago River & I. R. R., supra, 353 U.S. at 40, 77 S.Ct. at 640, 1 L.Ed.2d 622. But, as we held in Chicago, R. I. & P. R. R. v. Switchmen's Union, supra, 292 F.2d at 64-67, relating to an anti-strike injunction for an alleged union violation of its duty to bargain, that is a long way from saying that the Norris-La Guardia Act is to be wholly disregarded whenever an injunction is sought to prevent an alleged violation of the Railway Labor Act. See Order of Railroad Telegraphers v. Chicago & N. W. Ry., 362 U.S. 330, 338 and fn. 14, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960); Missouri-Illinois R. R. v. Order of Railway Conductors, 322 F.2d 793, 798 (8 Cir. 1963). The policy behind the Norris-La Guardia Act is strong and persistent, as the recent decision in Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), attests. Compare Publishers' Ass'n of New York City v. New York Mailers' Union, 317 F.2d 624, 626-628 (2 Cir.), cert. granted, 375 U.S. 901, 84 S.Ct. 192, 11 L.Ed.2d 142 (1963). "* * * Congress was intent upon taking the federal courts out of the labor injunction business except in the very limited circumstances left open for federal jurisdiction under the Norris-La Guardia Act." Marine Cooks and Stewards, AFL v. Panama SS. Co., 362 U.S. 365, 369, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960).
 
 
 89
 In contrast to the check-off appeal, Manning v. American Airlines, Inc., 2 Cir., 329 F.2d 32, this day decided, I see nothing in the circumstances here that would cause application of the Norris-La Guardia Act to conflict with the provisions of the Railway Labor Act, see 300 U.S. at 563, 57 S.Ct. 606, 81 L.Ed. 789; to the contrary, the policies of the two statutes coincide. Yet even if we assumed arguendo that the Chapter had met the requirement of § 7(a), 29 U.S.C. § 107(a), of showing that "unlawful acts" had been threatened or committed, I cannot see how it could be found that when the Chapter sought an injunction, it had made "every reasonable effort to settle" the dispute as to the handling of its opener of February 28, 1963, "either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration" or that, when the injunction issued on August 19, 1963, unlawful acts would be "committed * * * or * * * continued unless restrained" or that "substantial and irreparable injury to complainant's property" would have followed from denial, as §§ 8 and 7(a) and (b) of the Norris-La Guardia Act require. Quite apart from that statute, a party asking injunctive relief (as distinguished from one merely seeking to avoid dismissal for mootness) "must satisfy the court that relief is needed * * *, that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. * * To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations," United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). Even if I am wrong in concluding that American did not violate the Railway Labor Act, any violation consisted of a few unclear expressions which American had withdrawn by its letter of July 11; and the consummation of its negotiations with its pilots ended any need for the joint bargaining over which the whole squabble revolved. It is no answer that the injunction does little harm; apart from all else, for reasons previously outlined, efforts to involve a federal court in airline or railroad labor disputes in the absence of any compelling need for intervention ought not be thus encouraged.
 
 
 90
 For these three reasons, any one of them sufficient, I would reverse.
 
 
 
 Notes:
 
 
 [1]
 My brothers cite the provision in § 2 Third that "neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives." American did not do this. It agreed that the Chapter represented the engineers and should designate the spokesmen for them. What it did insist on was that the spokesmen should speak at meetings held jointly with the pilots, whose assent to the contemplated arrangement was essential. We have recently upheld an employer's lock-out of one craft of employees as a defensive measure against violation of a non-strike clause by another. New York Mailers' Union, etc. v. N. L. R. B., 327 F.2d 292 (2 Cir. 1964). Employer insistence upon joint bargaining with the two crafts for solution of a common problem would seem far more innocent
 
 
 [2]
 In contending the contrary my brothers make much of the point that in defending against the Chapter's attack, both in the District Court and here, American's counsel advanced, as one of several arguments, that the Chapter had ceded its rights to the committee. Though this claim was specious and its making was ill-advised, annoyance about it should not warp our judgment; one of the very reasons why the claim is specious is that it does not comport with what American did
 
 
 [3]
 Whitacre also conceded that he had told the engineers that retroactive pay under their 1961 reopener would have to be settled through the joint committee. But it is plain that he was talking about retroactive pay as part of a general settlement and there was no reason to think that the pilot members would have played any part in the negotiation. Whitacre had told Schwartz, the Chapter's counsel, on February 1, "I have no intention of taking away your rights under the Railway Labor Act. If you want to negotiate wages separately we will talk but the benefits of the pilot agreement go out the window." This was uncontradicted and is thoroughly consistent with the entire record. A separate negotiation that would not place an engineer in the third cockpit seat was just what the Chapter didnot want.
 
 
 [4]
 A point is made over the fact that in a letter dated January 28, 1963, Whitacre used the verb "recognized" with respect to the Joint Negotiating Committee. The letter was written to Ruby, President of ALPA; its purpose was to explain why American would not comply with his request to start a new negotiation with the ALPA central office and eliminate the Joint Committee in which the Chapter was happily participating. Since Whitacre's letter envisioned no change in the current method of negotiation, there was no need for concern by Schwartz, to whom he had courteously sent a copy, as he did also to Manning and to Chairman Edwards of the NMB. But since Schwartz' letter of January 29 proposing a continuation of the joint negotiation was unexceptionable, there was equally no occasion for Whitacre to reply
 
 
 [5]
 It is evident that Chairman Edwards was referring only to the bargaining agentfor the pilots; the complaint in the Ruby action had raised no issue as to the flight engineers.
 
 
 [6]
 "In connection with the pilot contract being signed today, the position of the Allied Pilots Association concerning the flight engineers on American Airlines should be made clear to the company. It is not our intention that the documents signed today be interpreted as covering, or in any way jeopardizing, the rights of the American flight engineers
 "If at any time in the future the American Airlines flight engineers indicate a desire to become part of the American pilot group and they have so indicated by the positive action of a majority of their group that they wish to join with us and to have one union in the cockpit, the Allied Pilots Association will accept all American flight engineers as pilot members, on fair and reasonable terms respecting the rights of both the flight engineers and the pilots. These terms shall include guaranteeing the priority to each flight engineer, in accordance with his seniority to the third seat on all aircraft operated by the company with three or more cockpit crew members, and the right to nondiscriminatory representation."
 
 
 [7]
 It is recognized that a considerable portion of the record related to the dispute between ALPA on the one hand and American and the American pilots on the other. But we indicated in Ruby, 323 F.2d at 256, that the complaint in that case should have been dismissed rather early in the game when it appeared that a dispute existed which would require action by the NMB under § 2 Ninth
 
 
 [8]
 The last three Annual Reports of the National Labor Relations Board reveal only one petition for injunctive relief for refusal to bargain in 1960, p. 148, none in 1961, p. 185, and four in 1962, pp. 233-34