INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO and International Association of Machinists and Aerospace Workers, AFL–CIO, District 100, Plaintiffs,

v.

ALITALIA AIRLINES, Defendant,

National Mediation Board, Third Party In Interest.

No. 83 Civ. 9106–CSH.

United States District Court, S.D. New York.

June 29, 1984.

---

Shapiro, Shiff, Beilly, Rosenberg & Fox, New York City, Highsaw & Mahoney, P.C., Washington, D.C., for plaintiffs; Sidney Fox, Gerald Richman, New York City, Clinton J. Miller, III, Washington, D.C., of counsel.

Burns, Summit, Rovins & Feldesman, New York City, for defendant Alitalia; Richard A. Wilsker, Michael J. DiMattia, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for National Mediation Bd.; Carolyn L. Simpson, Asst. U.S. Atty., New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge.

The International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM") has been certified by the National Mediation Board ("NMB") as the bargaining representative of certain employees of defendant Alitalia Airlines ("Alitalia"). For reasons clarified below, Alitalia refuses to recognize and bargain with IAM as the representative of some of these employees. IAM and its Local bring this action for equitable relief enforcing Alitalia's duty under § 2, Ninth of the Railway Labor Act (the "Act"), 45 U.S.C. § 152, Ninth, to bargain with the representative duly certified by the NMB.[1] The complaint also seeks a "status quo" injunction which would reverse certain actions Alitalia has allegedly taken in violation of its duty under § 6 of the Act, 45 U.S.C. § 156, not to change unilaterally its employees' conditions of employment prior to bargaining. A request for damages on behalf of those employees harmed by the alleged changes accompanies this request for injunctive relief. Before the Court now are the applications for preliminary equitable relief.

### I.

The facts surrounding the NMB certification, although complex, are not in dispute. IAM has actively represented some Alitalia employees since 1952. In August of that year, the NMB, pursuant to its mandate under 45 U.S.C. § 152, Ninth, certified IAM as the representative of what was then a single class[2] of Alitalia employees denoted as "Clerical, Office, Stores, Fleet and Passenger Service Employees." NMB Case No. R–2597 (August 8, 1952). The class by its terms included most of Alitalia's non-executive employees. Prior to certifying IAM, NMB conducted an election and found that nine of the eleven employees eligible to vote supported the union's representation.

It is not clear which employees IAM undertook to represent in the years immediately following the 1952 certification order, since there is no evidence indicating what steps IAM took in the first few years after the certification to implement it. However, the record is clear that, for whatever reasons, by 1961 IAM was actively representing—that is, bargaining on behalf of—only the fleet service personnel. In that year it sought to extend its representation to include certain passenger service employees, but Alitalia objected. At that time, according to Alitalia's uncontroverted records, the

1. With the consent of all parties, NMB was joined in this action as a "Third Party in Interest" on the strength of a suggestion by the Court of Appeals in *British Airways Board v. National Mediation Board*, 685 F.2d 52 (2d Cir.1982) that NMB might be a necessary party to any action in which, as here, the adequacy of NMB's procedures is challenged. 685 F.2d at 55, n. 2.

2. NMB uses the phrase "craft or class," here reduced to "class," to denote a single bargaining unit of employees which is represented by a single representative, typically a union.

parties jointly requested that the NMB appoint a mediator to conduct an election among the relevant employees to settle the issue of representation. Although the issue of representation would appear to have been settled by NMB's prior 1952 certification of IAM as these employees' representative, NMB complied with the request and sent a mediator. Despite the absence of any provision in the Act permitting a representation dispute to be settled by an election on consent of employer and union, the parties agreed to abide by the results of the election. IAM won.

A similar dispute between the parties arose in 1970. Again IAM sought to represent certain employees who were otherwise within the terms of the 1952 certification, and when Alitalia objected IAM agreed to settle the representation dispute through an election. The same mediator was asked to return and conduct a similar consent election. This time IAM lost among all but one subclass of employees. Thus by 1970 IAM actively represented only a portion of the employees for whom it was the certified representative.[3]

In 1976, the International Brotherhood of Teamsters ("Teamsters") sought from NMB certification to represent the Alitalia class of Clerical, Office, Stores, Fleet and Passenger Service employees—in other words, the whole class of employees for whom IAM had been certified in 1952. The Teamsters application precipitated a NMB investigation into the dealings between IAM and Alitalia. In reviewing these relations, NMB scolded the IAM and Alitalia for failing to conform their bargaining activity to the outlines of the 1952 certification. It noted:

> that it is [NMB] which determines the craft or class by the exercise of its powers pursuant to Section 2, Ninth of the Act, and that both the representative of the craft or class and the carrier must bargain collectively in such manner as not to exclude from the craft or class

employees or employee groupings which [NMB] has determined are properly included.

NMB Case No. R–4608 (July 2, 1976), at 2. The report recognized that IAM and Alitalia had failed in carrying out their responsibilities under the Act in part because of their reliance on the actions of the mediator, but it called such reliance "unwarranted". *Id.* The Act prescribes elections only if the employees—not the carrier—dispute the propriety of their representation. Because no "representation dispute pursuant to Section 2, Ninth of the Act existed among the employees" at the time of the prior mediations, elections were improper. *Id.* at 2–3. Because it found interest in Teamster representation among Alitalia employees insufficient to create a Section 2, Ninth "dispute," NMB concluded by reaffirming the validity of the 1952 certification of IAM and dismissing the Teamster application.

The record is barren of evidence indicating what steps, if any, the parties took to include the remainder of Alitalia's employees in IAM bargaining immediately after this 1976 decision. It is not disputed, however, that the limited scope of IAM's representation was not increased after the 1976 order. Instead, it continued to bargain on behalf of only Fleet Service personnel and a minority of Passenger Service employees. The evidentiary trail begins again in 1980, when the Office & Professional Employees International Union ("OPEIU") petitioned NMB to permit it to represent "Office Clerical Employees" at Alitalia. Such employees were within the 1952 order and thus ostensibly represented by IAM. They were, however, only a subclass of the certified bargaining unit. Therefore, NMB decided that resolving the question of whether OPEIU should be permitted to represent only the Officer Clerical workers required it to decide whether Office Clerical workers should be split off as a separate bargaining

---

**3.** IAM has made no attempt to explain its failure to act in accordance with the 1952 order. Nor is there any evidence bearing on the question of why IAM consented to individual elections rather than taking advantage of the rights apparently granted by the 1952 order by bringing a lawsuit like this one to compel bargaining.

unit from the remainder of the employees in the broad 1952 class. NMB again conducted an investigation. Rather than restricting its decision to officeworkers, NMB reviewed the whole of the Alitalia workforce, finding that it had grown from the eleven members of 1952 to over 450. NMB Case No. R–5134 (February 16, 1982), at 223. Such growth, NMB concluded, made division of the workforce into several bargaining units appropriate, and it split the employees into the classes of Fleet Service, Passenger Service, and Office Clerical Employees. It reaffirmed but amended the 1952 certification order to include these three classes of employees. In a later decision, NMB found interest among Office Clerical workers in union representation so low that it effectively decertified IAM. NMB Case No. R–5134 (May 13, 1982); Quinn Letter of May 18, 1983.

IAM finally attempted to assume its responsibilities under the 1952 certification order on July 7, 1982, by demanding that Alitalia bargain with IAM concerning the terms and conditions of employment of all the Fleet Service and Passenger Service employees.[4] Alitalia refused, claiming that "under the circumstances ... Alitalia does not believe that it is appropriate to force these employees into a union without affording them the democratic right to determine such a matter for themselves." Wilsker Affidavit of January 6, 1984, at ¶ 26. As a result of subsequent dealings between carrier and union, NMB has reaffirmed its position that IAM is the certified bargaining representative of the Fleet and Passenger Service employees. Quinn Letter of August 10, 1983. Since NMB is powerless under the Act to enforce the duties created by its certification orders, IAM brings this action to force Alitalia to

bargain in conformance with the 1952 order.

## II.

■ Alitalia has an affirmative, mandatory duty to bargain with a union properly certified by NMB as the representative of its employees. *Virginian Railway Co. v. System Federation No. 40,* 300 U.S. 515, 547–549, 57 S.Ct. 592, 599–601, 81 L.Ed. 789 (1937). The duty may be enforced in equity. *Id.,* at 553, 54 S.Ct. at 602. Alitalia's challenge is not to the original 1952 certification, which it concedes to have been the result of a proper exercise of NMB's power. Instead, Alitalia claims that NMB "grossly exceeded its statutory authority when it applied the original 1952 certification ... to both the new Passenger Unit and Fleet Unit without conducting an investigation of employee support." Alitalia argues that in light of the 1970 election results, which indicated that at that time the majority of the Passenger Service employees did not support the union, NMB's reaffirmation of the IAM certification without holding an election was improper.[5]

■ As Alitalia correctly points out, the aim of the Act is to provide a means for a carrier's employees to secure the type of representation which is favored by the majority. 45 U.S.C. § 152, Fourth. Of necessity, this includes the avoidance of union representation if that is the course which the majority prefers. *Russell v. National Mediation Board,* 714 F.2d 1332, 1343 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2385, 81 L.Ed.2d 344 (May 22, 1984). The duty of NMB is to further that aim by ascertaining and acting upon the will of the majority. If in fact a majority of the employees rejects union representation, it fol-

---

4. IAM originally attempted in 1982 to bargain on behalf of the Office Clerical employees, but in view of the NMB's later decertification it has withdrawn that demand.

5. Although Alitalia here asserts as defenses only impositions upon the rights of its employees, the Court of Appeals has held that a carrier has standing to challenge "an improperly certified representative" with "whatever limited defenses

may be available." *British Airway Board v. National Mediation Board,* 685 F.2d 52, 54, 55 (2d Cir.1982). Since any defenses asserted to demonstrate improper certification would seem inevitably to involve rights which in the first instance belong to the carrier's employees, *British Airways* appears to grant Alitalia standing to raise the claims asserted here.

lows that NMB's certification of union representation would violate the duties imposed on it by Section 2.

■ The Act does not, however, give NMB carte blanche to explore the representational desires of a carrier's employees. On the contrary, its freedom of operation is limited to the procedure specified in Section 2, Ninth:

> If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier.... In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier.

45 U.S.C. § 152, Ninth. In other words, NMB may not investigate and hold an election unless a dispute over representation has arisen among the carrier's employees. Absent such a dispute it is powerless.

■ Once a dispute does arise, however, NMB is given broad discretion in investigating and resolving it. The role of the judicial system in NMB matters is correspondingly "quite limited." *British Airways Board v. National Mediation Board,* 685 F.2d 52, 55 (2d Cir.1982). "The scope

of judicial review and intervention is confined to 'instances of constitutional dimension or gross violation of the statute.' " *Id.* at 55, quoting *International Brotherhood of Teamsters v. Brotherhood of Railway, Airline & Steamship Clerks,* 402 F.2d 196, 205 (D.C.Cir.), *cert. denied,* 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968). *Accord, Long Island Rail Road Co. v. National Mediation Board,* 703 F.2d 680, 681 (2d Cir.1983) (*per curiam*). This limited review, however, does permit inquiry to the extent of determining whether NMB fulfilled it statutory duty to conduct an investigation of a representation dispute and, if so, whether the investigation was "so inadequate as to be a non-performance of the duty." *British Airways, supra,* 685 F.2d at 56.

■ Alitalia asserts that the duty to investigate representation among the Fleet and Passenger Service employees arose when OPEIU petitioned to represent the Office Clerical workers. As described above, NMB did conduct an investigation, but it did not investigate the employees' preferences regarding representation. Rather, it looked into the propriety of splitting off a separate class of Office Clerical employees. Only after concluding that this was appropriate did NMB conduct an election.

NMB apparently interpreted the OPEIU's application as signalling a dispute among the Office Clerical staff, and it began an investigation. The result of the investigation was NMB's recognition that the increased complexity of Alitalia's operation since 1952 had created sufficient differences among the various types of employees to justify dividing them into three classes for purposes of bargaining. Although Alitalia grumbles about this decision, it does not challenge the propriety of splitting the bargaining unit.[6] Once the

---

**6.** Alitalia does make the collateral claim that NMB's 1980 amendment of the 1952 certification to divide the class into three classes was, in effect, a recertification. Thus, the argument goes, it required a pre-certification election. Alitalia cites no authority for its theory that

amendment is equivalent to recertification. The argument is at bottom an attempt to accomplish with labels what cannot be accomplished with principles. To label the action a recertification would simply be a conclusory method of finding a duty to investigate. I have outlined in

decision was made to split the 1952 class into three parts, OPEIU's request to represent the Office Clerical workers created a "dispute" only within that class. NMB no longer had any reason—or, arguably, authority—to inquire into the representation of Fleet and Passenger Service employees, since the status of their representation was not disputed among them.

Alitalia argues that instead of looking first to the appropriate bargaining unit definitions NMB should have begun its investigation with an election among all employees to determine their representational preferences. Because at the time OPEIU made its request the bargaining class consisted of all the employees who were later split into three classes, OPEIU's request created a dispute among all these employees, Fleet and Passenger Service as well as Office Clerical. Such a broad-based election, then, would apparently have been permitted by the Act. The Act, however, did not require it. Section 2, Ninth does not dictate specific investigation procedures to NMB. Elections are authorized as an expressly non-mandatory technique for ascertaining preferred representation.

Alitalia argues strenuously that such an election would have been a wise course. NMB was aware at the time of the OPEIU request that in 1970 several subclasses of Alitalia employees among the Passenger Service group had rejected IAM representation during a consent election. Further, the number of Alitalia employees had grown from eleven at the time of the 1952 election—the investigation and election on

which NMB premised its certification of IAM—to well over 400. Thus there was reason to think that IAM might not retain majority support, or, rather, there was little basis for the assumption that majority preferences had remained unchanged.[7]

NMB chose not to do so. NMB did carry out its duty to conduct an investigation, but it chose to focus the inquiry initially on the appropriate composition of Alitalia bargaining units. There were very good reasons for this choice. OPEIU sought only to represent Office Clerical workers. An election among all employees would have been pointless, for OPEIU did not undertake to represent those outside Office Clerical. Thus, in order to address directly the dispute created by OPEIU, NMB was required first to change the bargaining unit. Had the initial investigation revealed sufficient common inter-class interests to justify leaving undisturbed the 1952 class, NMB would presumably either have conducted an election among all personnel or have refused OPEIU's application altogether.

Such speculation is unnecessary to resolution of the question before me. When OPEIU petitioned, NMB was under a duty to investigate the dispute that petition created. NMB did investigate, and it had good reasons for conducting the investigation in the manner employed. Thus its investigation was not so inadequate as to constitute a non-performance of its duty under Section 2, Ninth. It is with this question that judicial inquiry must end. *British Airways, supra,* 685 F.2d at 56.

---

the text the occasions on which this duty to investigate arises. Finding no breach of this duty, I decline to enter through the back door Alitalia holds open. NMB viewed its action as carrying the existing certification over into the redefined classes. I can find no reason to disturb this discretionary action.

Given the thorough analysis in the NMB decision which spit up the bargaining unit, I reject out of hand Alitalia's suggestion that this action was in any way arbitrary. On the contrary, it was carefully considered.

7. Of course, the evidence available in 1980 which indicated that the majority of Alitalia employees were actually opposed to the existing certification of IAM was hardly overwhelming.

Most of the Fleet Service personnel were already actively represented by IAM, and they showed no signs of restiveness. It had been ten years since the Passenger Service personnel had been polled, and employee turnover was as likely to have invalidated the 1970 election results as to have reinforced them.

Alitalia emphasizes the resounding rejection of any union representation by the Office Clerical employees. While in hindsight this arguably *might* be evidence that IAM support among Passenger Service was weak, but see note 10, *infra,* the results of this election were not available to the NMB decisionmakers in 1980 when the OPEIU request was filed.

Alitalia may be correct that NMB should have jumped at the chance[8] to conduct an election among the Fleet and Passenger Service employees. However, the statute does not *require* any particular form of investigation and the specific form of an investigation is committed to NMB's discretion. *Brotherhood of Railway & Steamship Clerks v. Association for the Benefit of Non-Contract Employees,* 380 U.S. 650, 662, 667–668, 85 S.Ct. 1192, 1198, 1201, 14 L.Ed.2d 133 (1965).

I cannot help but be sympathetic to Alitalia's concerns. As it points out, there has been no attempt to poll the representational preferences of the relevant employees for 32 years. They may or may not wish to be represented by IAM. It is no answer to this worry to argue, as NMB does, that as any union certification ages turnover and growth among employees cause the currently-represented employees to be different from those who originally voted in the certification election. In most cases, continued active representation by the union justifies the assumption that an absence of disputes indicates continued approval. If employees were dissatisfied, a dispute would arise. Here, of course, no such assumption is warranted, for IAM has failed to carry out its obligation to actively represent all employees.[9] Any certification rendered now without the benefit of an election would seem wholly arbitrary. There is no information which would justify an inference of employee support for the IAM, least of all the 1952 vote among a workforce of eleven.[10] NMB has not, however,

recently certified IAM. It simply did what, in the absence of a dispute, the statute required it to do: affirm that a certification was made in 1952 which has never been disturbed and thus remains in full force and effect. The question of the wisdom of IAM's current certification simply cannot be addressed until a dispute among the employees arises. Until then, Alitalia, NMB, IAM, and the employees are all statutorily stuck with the 1952 results.

In spite of its vigorous complaints, it is not clear what legal course of action Alitalia proposes for NMB. NMB has no power to commence an investigation *sua sponte.* Section 2, Ninth, restricts its investigatory powers to disputes among employees. The 1961 and 1970 disputes were between Alitalia and IAM, not among employees. NMB's first possible opportunity to investigate arose with the Teamster petition in 1976, but NMB determined that there was insufficient support for the Teamsters to create a dispute. Investigation was not called for. Although NMB may decertify a union, it has no power to do so in the absence of a dispute. There is no provision in the statute or regulation for the lapse of certification should a union fail to undertake its duty of representation. In short, NMB was powerless to do anything but reaffirm the certification. In 1980, as discussed above, NMB arguably could have conducted an election, but it chose instead to narrow the bargaining units, a wholly legitimate procedure.

While it cannot help but make all involved uncomfortable to enforce a repre-

---

**8.** As discussed above, the Act gives NMB no power to *sua sponte* investigate representational preferences of employees. It must await a request "of either party to [a] dispute." 45 U.S.C. § 152, Ninth. The carrier is not one of the "parties" referred to by the statute which may invoke an investigation. *Bhd. of Railway & Steamship Clerks v. Assn. for the Benefit of Non-Contract Employees,* 380 U.S. 650, 666-667, 85 S.Ct. 1192, 1200–01, 14 L.Ed.2d 133 (1965).

**9.** In referring to unpolled employees, I am referring primarily to those in the Passenger Service class. IAM already represents most Fleet Service employees, and it is no longer certified to represent Office Clerical workers.

**10.** On the other hand, I do not accept Alitalia's position that available evidence implies rejection of IAM. The 1970 election was conducted fourteen years ago. I assume that because of employee expansion and turnover those 1970 voting Passenger Service workers constitute only a small portion of the current workforce. Nor are the Office Clerical election results particularly probative. As NMB found, these workers have different needs and concerns than those of the other two classes of workers. Their attitudes toward unionization may well be similarly different. In short, without an election there is simply no way to divine Passenger Service employee sentiment.

sentation certification without any clear indication that such representation is desired, the consequences are not as dire as defendant suggests. The employees may welcome—at long last—IAM's representation. If they do not, the Act provides a means for them to secure another representative or to rid themselves of union representation altogether. *See, e.g., Russell v. National Mediation Board, supra.* Although Alitalia suggests that NMB will not permit a *Russell*-type decertification, it presents no evidence to support the contention that the NMB will not obey the statute as authoritatively interpreted by the Fifth Circuit. I assume it will.

NMB has violated no statutory mandate. Its certification must be enforced. It remains to decide how this may be accomplished.

### III.

IAM requests an injunction which would compel Alitalia to bargain with it on behalf of all Fleet and Passenger Service employees and an injunction which would prevent Alitalia from unilaterally changing the terms and conditions of employment of these employees during negotiations and would restore to the rolls certain employees recently laid off by Alitalia. The two injunctions will be considered separately.

■ In *Ruby v. American Airlines, Inc.*, 329 F.2d 11 (2d Cir.1963), the district judge had entered an injunction compelling bargaining between parties covered by the Act after finding that the carrier had refused for approximately six months to bargain with its employees' representative. In approving the injunction the Court of Appeals held that "where, as in this case, the refus-

al to bargain is long continued and persistent and is clearly established by the proofs, the courts should grant relief by way of injunction." 329 F.2d at 22. The undisputed facts demonstrate that IAM is the properly certified representative of the Fleet and Passenger Service employees of Alitalia. At least since 1982 Alitalia has refused in the face of IAM demands to bargain with it on behalf of these employees. This satisfies the requirements under *Ruby* for injunctive relief.[11] Because there are no disputed facts, a trial on the merits is unwarranted. IAM is entitled to a grant of summary judgment and the entry of a permanent injunction compelling bargaining.

■ The status quo injunction presents a different situation. The Act forbids abrupt unilateral changes in terms of employment. Instead, carriers and representatives must submit proposed changes to the negotiation procedures established by the Act. Pending completion of these procedures, the parties are obligated to maintain the status quo. 45 U.S.C. § 156; *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 143, 90 S.Ct. 294, 295, 24 L.Ed.2d 325 (1969). When a proposed change precipitates a "major dispute," as the change detailed below would concededly do, the parties are entitled to equitable relief enjoining its implementation prior to completion of the Act's specified procedures. *Local 553, Transport Workers Union of America v. Eastern Airlines, Inc.*, 695 F.2d 668, 674 (2d Cir.1982). It is such an injunction IAM now requests.

In October and November 1983, Alitalia admittedly laid off certain employees with-

---

**11.** Alitalia insisted at oral argument that the equitable doctrine of laches should serve as a bar to the rendering of any type of equitable relief on IAM's behalf. Assuming that the doctrine is applicable, I find its invocation improper here. The earliest evidence of relations between IAM and Alitalia dates from 1961, when Alitalia refused in direct contravention of the 1952 NMB certification to recognize IAM as representative of certain of its employees. I will not permit Alitalia to invoke the equitable doctrine of laches when the evidence indicates

that the delay was caused in substantial part by Alitalia's unlawful behavior.

Delay after 1961 resulted from the reliance of both parties on the improper guidance of an NMB mediator. Since, as the remainder of this decision indicates, NMB is vested with wide discretion in interpreting and enforcing the Act, such reliance was not unreasonable. I will not penalize IAM for it. Further, I see no prejudice to Alitalia in enforcing this order. NMB's action was lawful in 1952 and it is lawful now.

in the Fleet Service and Passenger Service classes. Employees to be laid off were chosen by considerations of merit rather than seniority. IAM claims that merit-based layoffs were contrary to Alitalia's prior practice, which dictated that layoffs be made in order of inverse seniority. If IAM's contention of past practice is correct, Alitalia's action violated 45 U.S.C. § 156, and IAM is arguably entitled to a status quo injunction preventing future merit-based layoffs and restoring jobs to the workers laid off in violation of this past practice. Alitalia contends, however, that it has always maintained a policy of merit-based layoffs.

The only evidence submitted by the Union in support of its contention is a quotation from pages 8.5 and 8.6 of an Alitalia employee handbook entitled *"You and Alitalia,"* which reads:

What Value Does Seniority Have?

As your ALITALIA career progresses, many additional benefits will be coming your way. Higher salaries, added vacation allotments, improved insurance benefits and other items included in your total compensation program will increase as you accrue seniority.

Alitalia is still growing. The longer you are with us, the more opportunities will become available for your [sic] to grow. Your seniority is important when you are considered for promotion, transfer, or job change."

Alitalia, in turn, has submitted the affidavit of John Freyaldenhoven, Employee Relations Officer of Alitalia. According to Mr. Freyaldenhoven, Alitalia has never laid off according to seniority employees who are not under a collective bargaining contract. On the contrary, "if layoffs have been necessary, they have been based on employee performance and not on seniority." Freyaldenhoven Affidavit of February 2, 1984, at ¶ 2. He submits evidence of previous merit-based layoffs in both 1975 and 1977.

In order to gain preliminary injunction relief, IAM must demonstrate irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward itself. *Local 553, supra,* 695 F.2d at 675, n. 5. I find I need not reach the question of irreparable harm, for IAM has failed to convince me that it can demonstrate that Alitalia has taken any action in contravention of the status quo.

The manual quotation submitted by IAM is equivocal, to say the least. It does not expressly guarantee seniority-based layoffs. It simply states that certain benefits will accrue with seniority, specifically listing only benefits in the "compensation programs," and notes that seniority is "important" when transfer and job change decisions are made. Accepting that "job change" decisions include layoffs, the manual states only that seniority is important to the decision, not, as IAM contends, determinative. Even if there was no other evidence on the issue, I would hesitate to find that this raises a "serious question." However, Alitalia has provided testimony which flatly states that, regardless of what the handbook says, layoffs have never been based on seniority. This evidence must be viewed in light of the Court of Appeals' recent decision in *Air Cargo, Inc. v. Local Union 851, International Brotherhood of Teamsters,* 733 F.2d 241 (2d Cir.1984), which emphasizes that it is the "actual, objective working conditions ... which were in effect prior to the time the pending dispute arose" rather than the duties dictated by any written agreements which determine the status quo for the purposes of the Act. At 246, quoting *Shore Line, supra,* 396 U.S. at 153, 90 S.Ct. at 301. Regardless of the words in the handbook, Alitalia has submitted evidence that the prevailing practice was to base layoff decisions on merit. This testimony is essentially uncontradicted. Thus, I can only find that IAM has failed to meet its burden of demonstrating either a "likelihood of success on the merits" or even a "serious question" as to Alitalia's breach of the status quo. Because no violation has been

demonstrated, no status quo injunction is called for.

## IV.

I conclude that IAM is the properly certified representative of the Fleet Service and Passenger Service employees of Alitalia. It is therefore ordered that Alitalia immediately begin to "treat with" IAM on behalf of these employees as required by 45 U.S.C. § 152, Ninth, and to accord to those employees the rights and privileges granted to represented workers by the provisions of the Railway Labor Act. Because IAM has failed to demonstrate a likelihood that Alitalia is or might be violating the status quo provisions of the Act, the request for a preliminary injunction against their violation is denied.

It is SO ORDERED.