AMERICAN TRAIN DISPATCHERS
ASSOCIATION, Plaintiff,

v.

UNION PACIFIC RAILROAD CO., et
al., Defendants.

No. 87–0178–CV–W–8.

United States District Court,
W.D. Missouri, W.D.

June 11, 1987.

Thomas A. Woodley, Mulholland & Hickey, Washington, D.C., Joseph W. Moreland, Blake & Uhlig, Kansas City, Kan., for plaintiff.

Mark Goodwin, Law Dept., Union Pacific R. Co., Omaha, Neb., for defendant Union Pacific.

Roy P. Farrell and Jay Hadleman, North Kansas City, Mo., for defendant Missouri Pacific R. Co.

## MEMORANDUM OPINION
## AND ORDER

STEVENS, District Judge.

The above-captioned case was tried to the court, sitting without a jury, on March 26,

27, and 30, 1987. The ultimate issue before the court is the validity of a purported labor agreement executed on February 17, 1987, by officials of the Missouri Pacific Railroad and Jerry W. Murphy, then General Chairman of the American Train Dispatchers Association System Committee, and various other local union officeholders.

The court entered a temporary restraining order on February 27, 1987, which enjoined the parties from enforcing the agreement on its stated effective date of March 1, 1987. Following the trial of this matter, the parties agreed to stay any implementation of the agreement until this court's order finally resolving the question of the agreement's validity.

## FINDINGS OF FACT

*The Parties*

Plaintiff American Train Dispatchers Association ("ATDA" or "the union") is an unincorporated labor organization and a representative within the meaning of Section 1, Sixth of the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* Defendant Missouri Pacific Railroad Company ("MP" or "the railroad" or "carrier") is a corporation doing business in the state of Missouri and within this judicial district. Defendant Union Pacific Railroad Company ("UP") is also a corporation doing business in the state of Missouri and within this judicial district. Each defendant is a carrier within the meaning of Section 1, First of the RLA, 45 U.S.C. § 151 *et seq.*

The UP and MP railroads officially merged, with the approval of the Interstate Commerce Commission, in late 1982. The operations of the two railroads, however, are not yet completely integrated. The railroads' labor operations are separate, for example, and the MP train dispatchers are represented by the ATDA, while the UP train dispatchers are "non-agreement"[1] employees. Consequently, the wages, benefits, and work rules for the two groups of train dispatchers differ substantially. While both the UP and the MP are named

defendants in this case, the MP is the real defendant in that this case involves the labor negotiations between the MP and the train dispatchers on the MP, who are represented by the ATDA.

Since September 14, 1934, the ATDA has been the duly designated and authorized representative of the train dispatchers on the MP for collective bargaining purposes. This representation has been reaffirmed by the National Mediation Board ("NMB") as recently as 1985 when the NMB dismissed the application of a group seeking to displace the ATDA as the certified representative of the train dispatchers on the MP and indicated that the ATDA was still the representative of these employees.

The ATDA is a national labor organization which was formed in 1917. It represents approximately 2400 railroad employees, primarily train dispatchers, throughout the United States. The ATDA's supreme authority is the General Assembly, a convention of elected delegates that meets every four years. Between sessions of the General Assembly an elected six-person Executive Board, comprised of a President, Secretary–Treasurer, and four Vice Presidents, acts for and directs the ATDA. The Executive Board members are the national officers of the ATDA.

There also exists an ATDA System Committee on each railroad, or "property," on which the ATDA represents train dispatchers. The System Committee is comprised of a General Chairman, sometimes a Treasurer, a Vice General Chairman, and one or more Office Chairmen. The System Committee is, essentially, the ATDA local union officers, while the Executive Board members are the ATDA national officers.

It is undisputable that within the ATDA, the authority flows downward from the President or the national officers. Pursuant to the ATDA constitution, the President is the official head of the ATDA and is responsible for supervising the work and policies of the ATDA. The President is

---

**1.** The UP train dispatchers do in fact have an agreement. It was entered into in 1957 and effectively cancelled all then-existing labor agreements. The UP train dispatchers are, therefore, considered by the carrier to be non-agreement, management-type employees.

entrusted with the following duties and authority, among others: to interpret all laws of the ATDA; to direct and supervise all System Committees and their officers, including the power to summarily suspend any General Chairman or other System Committee officer; to approve, modify, reverse or suspend any decision of a System Committee officer; to direct and approve all collective bargaining negotiations and matters pertaining thereto; and to assign duties to the Vice Presidents.

The General Chairman of the System Committee is elected by the members of the collective bargaining unit on the individual properties or railroad (referred to in the ATDA constitution as a single "transportation system"). The General Chairman is primarily responsible for handling grievances, subject to the President's final decision on appeal. The General Chairman may have the authority to conduct negotiations with a railroad; a power that derives from the practice of the President in delegating such authority and not literally from the ATDA constitution. While the General Chairman may be delegated authority from the President to negotiate with the railroad, the power to consummate collective bargaining agreements lies ultimately with the President of the ATDA.

Since the time the ATDA was certified as the representative of the MP train dispatchers, the ATDA and the MP have entered into numerous collective bargaining agreements. The master collective bargaining agreement between the two parties became effective December 1, 1962, and, like other collective bargaining agreements between the parties, has continuing effect.

Historically, labor negotiations between the ATDA and the MP have taken place at both the national and the local level. Occasionally, the MP has delegated its negotiating responsibility to the National Railway Labor Conference ("NRLC"). The NRLC is a national association of most of the major railroads in the country. On behalf of its member railroads, the NRLC negotiates and enters into agreements with national labor organizations such as the ATDA. The NRLC and the ATDA, acting on the national level, have executed many agreements over time.

Negotiations between the ATDA and most railroads over increases in wages and benefits and work rule changes have usually been handled at the national level with the NRLC. In general, the ATDA has followed a practice of serving its new bargaining proposals (known as Section 6 notices, pursuant to Section 6 of the RLA) through the ATDA General Chairman on each railroad property where it represents train dispatchers. The carriers then authorize the NRLC to handle negotiations at the national level and bargaining ensues with the ATDA. This approach, commonly referred to as "national handling," was followed with respect to the ATDA's Section 6 notices served on various carriers in February, 1981, including the MP.

As a result of those negotiations, a national agreement was reached between the ATDA and the NRLC (on behalf of the MP and other carriers) on February 22, 1982, providing for increases in wages and benefits and changes in certain employment rules. The agreement contained a "moratorium" clause which provided that no party could serve a new notice or proposal to modify the agreement prior to 1984.

When the ATDA and the MP have executed agreements that resulted from national negotiations between the nation's major railroads, represented by the NRLC, and the ATDA, the agreements are invariably signed by the national officers of the ATDA. The evidence also demonstrated that when smaller-scale negotiations between only the MP and the ATDA resulted in agreement, General Chairman Murphy executed the agreement and an ATDA Vice President approved the agreement by signing an approval line below the General Chairman's signature.

The defendant carriers offered documentary evidence which demonstrated that in a few instances General Chairman Murphy had executed agreements with MP labor officials without the approval of a national officer. These agreements concerned refinements of the parties' master collective bargaining agreement and were usually in

the form of a letter sent by an MP labor official to Murphy to confirm discussions that had apparently taken place previously. Murphy executed these agreements by signing an "agreed" line at the bottom of the letter.

*The 1984 Negotiations*

On February 26, 1984, then ATDA President R.E. Johnson sent a letter to all ATDA General Chairmen advising them the ATDA Executive Board had prepared the organization's draft Section 6 notice for the national movement to be served in the customary manner through each General Chairman. The letter contained instructions for service of the proposal on the carriers, a draft of the Section 6 notice to be served by the General Chairmen, and an Attachment "A" setting forth the organization's proposed changes in existing agreements. President Johnson's letter also advised the General Chairmen that "[i]f you have something on your particular property that you wish to serve a SEPERATE (sic) Section 6 Notice(s) on the Carrier, this is your permission to do so, and if you need help in drafting it, let me know."

The ATDA decided that not every railroad should be placed in national negotiations in 1984 with respect to wages, health and welfare benefits, and work rules because of peculiar problems affecting dispatchers employed by certain carriers. For example, in the case of the MP, it was effectuating its merger and consolidation with the UP. The dispatchers on the UP were not represented by the ATDA, and they had different work rules and higher wages than the ATDA-represented dispatchers on the MP. For this and other reasons, the ATDA determined that negotiations with the MP at the national level would encompass only health and welfare benefits, and that wage improvements and work rule changes would be negotiated separately with MP officials at the local level.

On February 29, 1984, President Johnson sent the ATDA's Section 6 bargaining notice with respect to health and welfare items to MP Director of Labor Relations–Personnel O.B. Sayers, and requested that

the carrier waive the initial negotiating conference and authorize the NRLC to handle those issues on a national basis. On March 12, 1984, Sayers sent Johnson a letter acknowledging receipt of his February 29 Section 6 notice. Sayers indicated that the MP was agreeable to handling the health and welfare issues through the NRLC and he attached the MP's own Section 6 bargaining notice concerning the same issues. Johnson acknowledged receipt of Sayers' correspondence by letter dated March 20, 1984, and stated his agreement to handling the health and welfare issues with the NRLC. Copies of Johnson's letter were sent to ATDA Vice President John McCall and ATDA MP System Committee General Chairman J.W. Murphy.

On April 26, 1984, ATDA MP General Chairman Murphy sent a letter and Section 6 notice to the MP's Director–Labor Relations Non–Ops, V.E. Hanika, with respect to work rules and other matters. The notice contained an Attachment "A" which, with the exception of the proposed adjustment in straight time rates, was substantially the same attachment previously distributed by ATDA President Johnson to all General Chairmen. Copies of this notice were sent by Murphy to President Johnson and Vice President McCall. On May 7, 1984, Hanika acknowledged receipt of Murphy's letter, served the carrier's own Section 6 notice regarding compensation and rules, and requested national handling by the NRLC. On May 7, 8, and 9, and June 5, 1984, Murphy sent Hanika several additional Section 6 notices, for a total of six, regarding wage increases and other matters.

There was substantial disagreement between the ATDA representatives at all levels and the MP officials over whether the Section 6 notices of the MP train dispatchers served by Murphy should be in national or local handling. Throughout the period from 1984 to early 1987, the position of the MP was that these Section 6 proposals should be in national handling. The ATDA officials wanted these Section 6 proposals negotiated locally.

There was no dispute between the parties as to the fact that the MP dispatchers were part of the national handling on health and welfare. The health and welfare negotiations, and ultimately the national agreement on that issue, are not part of this lawsuit. Only the handling of the six Section 6 notices served by ATDA MP System Committee Chairman Murphy on the MP labor officials, which ultimately lead to the purported agreement of February 17, 1987, is at issue in this case.

*The Parties' Negotiations on Section 6 Notices*

Because the carrier and the union were deadlocked on the proper forum for negotiating Murphy's Section 6 notices, on June 20, 1984, ATDA President Johnson submitted six applications, one for each of the six Section 6 notices served on the MP by General Chairman Murphy, to the NMB requesting mediation on the issues raised by the Section 6 notices pursuant to Section 5, First of the RLA. Subsequently, the NMB assigned case numbers to each such request. All correspondence to and from the NMB regarding the mediation stage was signed by or addressed to ATDA President Johnson; MP officials, including MP Director of Labor Relations O.B. Sayers, received this correspondence.

Eventually, the NMB appointed a mediator and set a date for a mediation session between the parties to be held on November 20, 1984. ATDA President Johnson designated ATDA Vice President John McCall to represent the ATDA in the mediation before the NMB and so informed both the NMB and MP officials. Although the November 20, 1984, mediation session was postponed, eventually mediation sessions were conducted in early 1985 with MP Director of Labor Relations T.R. Green and Hanika attending on behalf of MP and ATDA Vice President McCall and General Chairman Murphy attending on behalf of the ATDA.

As to three of the six cases, the parties agreed on local handling and eventually

settled two of those three cases (NMB Case Nos. 11438 and 11439).[2] The other three cases—Nos. 11436, 11437, and 11441—were not so easily resolved because of the continuing dispute over national versus local handling. The MP officials consistently maintained during the mediation period that they had delegated their bargaining authority to the NRLC for national handling on the issues raised by the remaining three cases. The mediation stage of these three cases is currently in recess and the NMB files are still open.

ATDA Vice President McCall and President Johnson began considering other options—either requesting to be released from mediation in order to proceed to arbitration or court action—to break the stalemate at the mediation stage. Even while officially maintaining that national handling was the appropriate way to resolve the remaining three cases, the MP labor relations officers began to negotiate locally with General Chairman Murphy without the participation of Vice President McCall.

Murphy had been instructed by current ATDA President Robert J. Irvin, who replaced Johnson as ATDA President on July 1, 1986, that he (Murphy) could negotiate with MP on the subject of equalizing rates of pay for MP train dispatchers with the pay of the UP train dispatchers. Irvin expected these local negotiations between General Chairman Murphy and the MP officials to be held within the context of the three pending mediation cases. Irvin delegated this limited negotiating authority to Murphy with instructions that Irvin be kept apprised of the negotiations.

In late 1986, President Irvin wrote to the NMB to seek resumption of mediation on the three pending cases and to inform the NMB that ATDA Vice President Bennett would replace Vice President McCall as the ATDA representative for the pending negotiations and mediation with the MP.

About the same time, in early December 1986, General Chairman Murphy received an offer from the carrier through Assistant

---

2. The final disposition of the third, locally handled case (NMB Case No. 11440) is not clear from the evidence presented at trial.

Vice President Labor Relations John Marchant to raise MP train dispatchers' salaries to the level of UP dispatchers if the MP dispatchers were willing to become "non-agreement" employees. Murphy informed President Irvin of the carrier's proposal by enclosing a copy of it in a letter to Irvin dated December 12, 1986. In this letter, Murphy stated that such an agreement with MP/UP could be reached while retaining the union shop and ATDA representation.

Carrier representatives including Marchant and UP Vice President Labor Relations Thomas Watts attended another meeting with Murphy and several local Office Chairmen on December 16, 1986, at the Kansas City Airport. Murphy stated at this meeting that he was willing to cancel all agreements with the exception of the union shop agreement (which obligates the dispatchers to pay dues to support the organization as a condition of continued employment). Murphy further stated that the International office of the ATDA would not approve any agreement, and would overrule any agreement, which eliminated the existing union shop provisions.

While the carrier officials testified that they believed Murphy to be "bluffing" in order to negotiate a favorable agreement, in fact, ATDA President Irvin and Murphy had a telephone conversation in early January 1987, in which Irvin told Murphy that the ATDA would not accept the abrogation of the union shop provisions. Nonetheless, on January 27, 1987, Murphy distributed a cover letter to all MP dispatchers, together with the carrier's proposal and a ballot in order to vote on the proposal.

In the meantime, on January 26, 27, and 28, 1987, ATDA President Irvin and other ATDA national officers were meeting with NRLC officials in Washington, D.C. in an effort to settle the organization's national negotiations. The issue arose as to whether the wage and rule Section 6 notices that the ATDA served locally on the MP were being handled on a national or local basis. NRLC Chairman Hopkins informed an unsuspecting Irvin that the issue was moot because General Chairman Murphy and the MP train dispatchers were conducting a vote on the MP's proposal involving the elimination of all ATDA agreements. Irvin immediately telephoned Murphy on January 27, 1987, to register his concern and opposition. Murphy apologized for neglecting to inform Irvin of the vote scheduled for February 9, 1987. Murphy wrote a follow-up letter to Irvin to assure him that Murphy would let him know the results of the vote. Murphy never did so.

On February 3, 1987, MP Assistant Vice President Labor Relations Marchant; UP Director of Labor Relations, Non–Ops Dean Matter; and O.B. Sayers represented the MP in a meeting with Murphy, several local Office Chairmen, and train dispatchers to discuss the carrier's offer. During this meeting the subject of the ATDA's constitution was raised, as well as the issues of whether the International would be satisfied with the elimination of the union shop agreement and whether Murphy had authority to enter into such an agreement.

On February 10, 1987, Marchant and Matter again met with Murphy and an ATDA Office Chairman in Dallas; Murphy stated that the dispatchers had voted 93 to 35 to accept the carrier's offer. Marchant brought with him a draft agreement prepared by the railroad which provided for the cancellation of all agreements, the withdrawal of all pending grievances, the withdrawal of all pending bargaining proposals, and a bar against taking self-help or striking during the time period that any current dispatcher is still employed by the MP (a period estimated to be from thirty to as long as fifty years). Murphy initialed the tentative agreement and said he would send it to the national office of the ATDA for review. Murphy also said that the national office could "nullify" the arrangement and that any nullification by the national office would be known by Monday, February 16. They discussed their plans to meet in Dallas on February 17, 1987, to sign the agreement.

The tentative agreement which was initialed by Murphy and Marchant on February 10, 1987, erroneously read "Union Pacific" rather than "Missouri Pacific." Mur-

phy initialed the "agreement" for the ATDA. Conspicuously, there was no approval line for an ATDA Vice President. Marchant initialed the "agreement" and also initialed for another MP official who was not present. All the credible testimony indicated that the policy and practice of parties to labor agreements, including these two entities, is that initialed agreements are tentative and not binding. Even the carriers' representatives testified that at the time of initialing the proposed agreement on February 10, 1987, they believed it was tentative and not yet binding on the ATDA.

On February 13, 1986, Irvin telephoned Murphy.[3] When Murphy disclosed that he was planning to execute an agreement to abrogate all existing labor contracts, Irvin stressed that he was without authority to do so. A very heated discussion ensued and Murphy stated that he still intended to go forward and sign the agreement on February 17 with the MP officials. Irvin told Murphy not to sign any such agreement and then informed Murphy that he would contact the carrier to make certain that the MP understood that Murphy did not have the authority to execute such an agreement without the prior approval of an ATDA national officer.

Immediately following his conversation with Murphy on February 13, 1986, President Irvin sent a mailgram to UP Vice President Labor Relations–Personnel Thomas L. Watts to make sure that the carrier knew that Murphy did not have authority to enter into an agreement that cancelled all ATDA agreements. The mailgram read as follows:

> Consistent with our Constitution and By-laws, this is to advise that effective immediately I am suspending the authority of General Chairman J.W. Murphy and other local ATDA officers to execute agreements on behalf of ATDA unless they are approved in advance by the undersigned, or one of the other national officers designated below:
>
> D.E. Collins, Secretary–Treasurer
> G.D. Bennett, Vice President
> W.A. Clifford, Vice President
> M.A. Swartz, Vice President
> H.E. Mullinax, Vice President
>
> We desire to meet with the Carrier at your earliest convenience in order to discuss proposed changes in or abrogation of existing agreements. Our Vice President Bennett will contact your office for that purpose in the very near future.
>
> Very truly yours,
> R.J. Irvin
> President

An identical letter was sent to Watts on February 13, 1987, certified mail, return receipt requested.

On February 14, 1987, Murphy telephoned Marchant and notified him that the ATDA national office opposed the execution of any arrangement abrogating all ATDA agreements and that Irvin was sending the carrier a mailgram suspending any authority Murphy might have to execute such an arrangement. Vice President Labor Relations Watts and Assistant Vice President Labor Relations Marchant received and read Irvin's mailgram on February 16, 1987. Nevertheless, both decided to go forward with the meeting scheduled in Dallas for February 17, 1987, for the purpose of executing the carrier's proposed agreement with Murphy.

Irvin's directions to the contrary notwithstanding, carrier officials Marchant and Matter met with Murphy and the local Office Chairmen on February 17. Although Murphy expressed concern that the national office of the ATDA would probably remove him from office as General Chairman, remove the System Committee officers and also "ignore"[4] the proposed

---

**3.** It was somewhat coincidental that Irvin called Murphy on February 13; Irvin was not calling to inquire about the "agreement" initialed February 10, 1987, because Irvin did not learn of this document until his deposition was taken in this case.

**4.** There was substantial disagreement between the witnesses for the respective parties about the meaning of the word "ignore" used by Murphy in this context. The ATDA would have the court believe the word was used as a synonym for "nullify," while the UP/MP officials believed Murphy meant "turn their heads the other way."

agreement, he and the others present proceeded to sign the document entitled "Agreement between Missouri Pacific Railroad Company and American Train Dispatchers Association." Other signers included the Vice General Chairman of the ATDA System Committee and three Office Chairmen in attendance. No trial witness could recall Office Chairmen ever signing a labor agreement on any prior occasion.

The document executed provides that, effective March 1, 1987, all collective bargaining agreement provisions applicable to the various classifications of dispatchers are eliminated, all pending claims and/or grievances are withdrawn, all pending notices or bargaining proposals are withdrawn, and any new bargaining proposals may not be progressed to a strike or other self-help measures by the ATDA or its members until all present dispatchers are no longer employed by the carrier.

Upon learning that Murphy and the MP had executed a document contrary to his instruction and mailgram, ATDA President Irvin promptly contacted the carrier's officials and arranged a meeting for February 20, 1987, with ATDA Secretary-Treasurer D.E. Collins and the carrier's representatives Watts, Marchant and Matter in order to protest the carrier's actions. At this meeting, President Irvin first requested a copy of the agreement the parties had reached and was given the "agreement" executed by General Chairman Murphy on February 17, 1987.

Irvin maintained to the carrier that this agreement had no force and effect because neither Murphy nor the other local union officers had authority to enter into the arrangement on behalf of the ATDA. President Irvin maintained to the carriers' officials that the ATDA was the legal representative and that Murphy only served as the agent of the ATDA on the property of the MP, that the limited authority he had to act on behalf of the ATDA had been properly suspended, and that the carrier had been notified of this by a mailgram which the carrier received prior to February 17. He also expressed his concern about the loss of rights and protections contained in existing agreements with the ATDA, including the members' health and welfare coverage under Travelers' insurance policy GA-23000. The carriers' officials stated that they considered the "agreement" dated February 17, 1987, valid and binding and that they intended to implement the arrangement on its effective date of March 1, 1987.

President Irvin asked Watts and Marchant whether they would continue to enter into future agreements with Murphy notwithstanding his mailgram and they said they would. When he suggested that they consider new terms of an agreement with the ATDA, the carriers' officials reiterated their position that the February 17, 1987, agreement was valid and final and that they were not interested in entering into any further amendments or agreements. President Irvin then advised the carriers' officials that the RLA had been violated and that the ATDA was left with no choice but to pursue a court action to remedy the carriers' misconduct. Watts then told Irvin to call his attorney.

On February 27, 1987, this court issued a temporary restraining order enjoining the defendants MP and UP from implementing the "agreement" executed on February 17, 1987. General Chairman Murphy has since been suspended from his office by ATDA President Irvin as a result of his actions in disregarding Irvin's directives.

## CONCLUSIONS OF LAW

This court has jurisdiction over this action pursuant to 45 U.S.C. § 151 *et seq.* and 28 U.S.C. §§ 1331, 1337. Plaintiff seeks declaratory and injunctive relief.

Plaintiff ATDA maintains that the purported agreement executed February 17, 1987, by ATDA General Chairman Murphy and various other local union officers on behalf of the ATDA and two labor relations officers of the Missouri Pacific Railroad is without effect because Murphy had no authority to bind the organization. Conversely, the defendant carriers argue that Murphy did have either actual or apparent authority to bind the ATDA. The carriers argue that even if Murphy's authority was

suspended before the February 17, 1987, signing, the parties had an enforceable agreement "by no later than February 12, 1987." Defendants alternatively maintain that the ATDA should be estopped from arguing that Murphy's agreement is unenforceable because it was the ATDA that insisted that the Section 6 notices be negotiated locally and not as part of the national movement.

The court will consider these arguments after first determining the underlying contested issue of who, ultimately, speaks for the train dispatchers on the MP in collective bargaining matters. Both the carrier and the union agree that the ATDA is the duly authorized collective bargaining representative of the MP train dispatchers. They disagree, however, on whether the international/national officers or the local System Committee officers speak for the ATDA on behalf of the organization's members.

Plaintiff brings two decisions of the United States Court of Appeals for the Eighth Circuit to the attention of this court. In *Childers v. Brotherhood of Railroad Trainmen*, 192 F.2d 956 (8th Cir.1951), the Court of Appeals affirmed a decision of this court which held that the local lodge was not the authorized and designated bargaining representative of the subject employees. Rather, the appellate court agreed with the district court that the national organization, not the local affiliate, is the collective bargaining representative within the meaning of the RLA.

■ Defendants would have this court distinguish *Childers* on the factual differences between it and the case at bar. In *Childers*, the national president of a union made a decision which resolved a dispute between two local lodges over who was to perform certain train switching work. The dissatisfied local then sued the national organization asking the court to invalidate the president's decision. The district court declined to do so and was affirmed on appeal. While the *Childers* facts are obviously somewhat different than the facts of this dispute, the court finds that the holding on who ultimately speaks for the em-

ployees is equally applicable to this case. In cases decided under the National Labor Relations Act, courts faced with this issue of local versus national authority have consistently determined that the international or national parent is the certified bargaining representative with whom the company must bargain. *See, e.g., Whisper Soft Mills, Inc. v. N.L.R.B.,* 754 F.2d 1381, 1385–86 (9th Cir.1984).

The second case from this circuit cited by plaintiffs merely cites *Childers* for the same proposition. *See ·Neal v. System Board of Adjustment,* 348 F.2d 722, 728 (8th Cir.1965).

In this case, as in *Childers*, the union's constitution clearly provides that the ultimate authority to make day-to-day decisions for the ATDA, between sessions of the General Assembly, lies with the union's national/international president. The ATDA Constitution explicitly provides in Article IV, Section 2. that the president has direction and control of all System Committees and their officers. That same Section further provides that "[t]he President shall have authority to ... modify, defer, suspend, or reverse any decision of a General Chairman, System Committee, or any officer thereof...."

■ Even if there were any doubt or unclarity as to the constitutional provisions on authority to negotiate and enter into collective bargaining agreement on behalf of the ATDA, the President is explicitly entrusted by the ATDA Constitution and By–Laws, Article IV, Section 1, with the duty to "interpret all laws of the Association." The decisions of the ATDA President in interpreting the union's internal laws are not subject to court review unless patently unreasonable. *See Newell v. International Brotherhood of Electrical Workers (IBEW),* 789 F.2d 1186, 1189 (5th Cir.1986), *citing Stelling v. IBEW,* 587 F.2d 1379, 1389 (9th Cir.1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979). There is no evidence in this case that President Irvin's construction of his powers is patently unreasonable.

Finally, the past practice and course of negotiations between the MP and the

ATDA, particularly in connection with the 1984 Section 6 notices served by Murphy locally, demonstrate that the national office of the ATDA is ultimately responsible for consummating collective bargaining agreements especially those of great importance. As discussed in the factual findings, *supra,* most collective bargaining agreements or amendments, particularly the most important or far-reaching, were signed by the ATDA President or approved by an ATDA Vice President.

At trial, it was undisputed that it was unprecedented in the parties' relations for a General Chairman to negotiate and execute such an agreement. It was folly for defendants to presume that a General Chairman was empowered to negotiate and consummate an agreement of this character—abrogating all preexisting agreements between the parties—without the approval of a national officer. Indeed, the facts reveal that the MP officials continually questioned Murphy's authority to enter such a far-reaching agreement.

There still exists the possibility, as defendants argue, that ATDA President Johnson or Irvin delegated to Murphy the authority to negotiate the agreement with the MP. While the national ATDA is the certified bargaining representative of the MP train dispatchers, the national officers may authorize negotiations between the carrier and the union's local. The defendant carriers assert that ATDA General Chairman Murphy had either actual authority or apparent authority to negotiate and execute, on behalf of the ATDA, the February 17, 1987, agreement, which purports to abrogate all preexisting agreements between the ATDA and the MP, including the 1962 master agreement and others negotiated at the national level.

■ The court need not belabor its discussion of this argument. Assuming, for argument's sake, that Murphy did have actual or apparent authority to negotiate to completion such an agreement with the MP, it is undisputed that any such authority was suspended by ATDA President Irvin's mailgram which was admittedly received and read before the February 17, 1987, agreement was executed.

Defendants argue, alternatively, that they had an enforceable agreement with Murphy, acting for the ATDA, by February 12, 1987. Defendants' theory is apparently that the initialed and admittedly tentative "agreement" of February 10, 1987, became enforceable on February 12, 1987, when General Chairman Murphy communicated to the carrier the agreement of the entire System Committee.

■ This court does not find that a determination of effective time or dates— whether February 12 or February 17—is at all necessary to decide this case on the issue of actual authority. Murphy could no more execute a contract purporting to bind the ATDA on February 10 or 12 than he could on February 17 because he was without actual authority to enter into this contract for the ATDA at any time. The facts demonstrate that President Irvin told Murphy he could not agree to abrogate the union shop provisions of the parties' agreements. Both the initialed document dated February 10, 1987, and the signed document dated February 17, 1987, contain such an unauthorized provision.

The court finally considers the carriers' argument that, even if General Chairman Murphy did not have, or exceeded, actual authority to enter into this agreement for the ATDA, the February 10, 1987, agreement is binding because Murphy had apparent authority to enter into the agreement prior to February 13, 1987. As discussed above, the court does not believe there was an agreement of any sort entered into prior to the February 17 session in Dallas. The February 10 initialed document was admittedly tentative pending the notification and approval of the ATDA national office and the rest of the System Committee members. On the 13th of February, Irvin unequivocally instructed Murphy not to sign any agreement abrogating all existing labor contracts; Murphy relayed this instruction to Marchant on the 14th. Thus, no event occurred between the 10th and the 16th which could have consummated the parties' oral "agreement," or which demon-

strates that an oral contract was reached and that the only thing left to do was to reduce it to writing later.

Even if the facts were different and Murphy had not communicated to MP's Marchant Murphy's instructions from national not to enter into the agreement, defendants' apparent authority argument would fail. Under Missouri law, apparent authority exists "when the principal has created such an appearance of things that it causes a third party reasonably and prudently to believe that a second person has the power to act as the principal's agent." *Mahoney v. Delaware McDonald's Corp.*, 770 F.2d 123, 126 (8th Cir.1985).

Although Murphy was a local union officer with limited authority to negotiate on behalf of the ATDA, the facts demonstrate that it was neither reasonable nor prudent for the MP officials to believe he had the power to enter into an agreement like that proposed by the railroad. First, the carriers had actual notice, from the mouth of Murphy, that (1) he had to get national's approval for the agreement, (2) that national would never agree to abrogate the union shop or all existing labor contracts, and (3) that Irvin had told him explicitly that he could not enter into the proposed agreement. In addition, the railroad officials demonstrated their personal doubts that Murphy had authority to enter into such a far-reaching agreement by continually questioning Murphy's authority, and, especially, by discussing with Murphy the effects of national's "nullification" of the agreement. The bargaining notes taken by defendants' representatives reflect that they entertained serious doubts that national would approve the agreement. This indicates that the defendant carriers' knowing Murphy was without authority to act on his own, were nonetheless trying to "pull something off" and hoping the national organization would turn its head.

It is basic to common law agency principles that apparent authority may result only from the acts of the principal, not from any acts of the agent. *See Henry v. Cervantes-Diversified and Associates*, 700 S.W.2d 89 (Mo.App.1985). In all official correspondence relating to the pending Section 6 notices, the ATDA stated that Vice President McCall, and later Vice President Bennett, represented the ATDA. From past practice, the carriers were on notice that an ATDA Vice President's approval was required to execute such a significant labor relations agreement.

■ Furthermore, the court finds without merit defendant's argument that the ATDA is estopped from maintaining that the "agreement" is unenforceable because the ATDA insisted on local handling of the Section 6 notices served by Murphy. None of the testimony at trial indicated that either party associated the disagreement over national versus local handling with the delegation of authority from the national to the local union officers. The parties agreed that it was not uncommon for a carrier and a union to negotiate at both the national and local levels simultaneously. Moreover, even while insisting on local handling of all issues other than the health and welfare package, the ATDA President clearly appointed national Vice Presidents McCall and Bennett to negotiate and act for the union in the local negotiations. Thus, there is no factual evidence to support defendants' waiver or estoppel defenses.

Accordingly, the court finds each of defendants' arguments to be without merit. The February 17, 1987, "agreement" is void and unenforceable because it was signed after clear notice that Murphy had no authority to contract for the ATDA. Any tentative agreement discussed February 10 and in the days following was never consummated because Murphy had neither actual nor apparent authority to do so.

Finally, the court is disturbed by defendants' protestations that because of the suspension of Murphy from his position as General Chairman, the carriers do not know with whom to negotiate. The answer is simple—the carrier is under a duty to treat with the ATDA's duly designated representative. *See* 45 U.S.C. § 152, Ninth. At this writing, that interim representative, pursuant to a letter dated February 25, 1987, from ATDA President Irvin to MP

**1546**

Vice President Watts, is ATDA Vice President Bennett. Accordingly, so long as the ATDA is the representative of the MP dispatchers,[5] the carrier must bargain in good faith with their representative.

In conclusion, it is

ORDERED that the defendants Missouri Pacific Railroad Company and Union Pacific Railroad Company, their officers, agents, representatives, servants, and employees are hereby enjoined from implementing or otherwise giving effect to the purported "Agreement between Missouri Pacific Railroad Company and American Train Dispatchers Association" dated February 17, 1987, or any predecessor agreement of which there was evidence in this record. It is further

ORDERED that the defendants Missouri Pacific Railroad Company and Union Pacific Railroad Company, their officers, agents, representatives, servants, and employees are enjoined from failing and refusing to bargain in good faith with the plaintiff ATDA as the representative of the Missouri Pacific train dispatchers.

---

**5.** From some of the arguments proferred by defendants at trial, the court feels obliged to remind all parties that it is no defense to the conduct of the carriers and some of the local union officers that they were doing what they believed a majority of MP train dispatchers may have desired. *See, e.g., International Associa-* *tion of Machinists v. Alitalia Airlines,* 753 F.2d 3, 4 (2nd Cir.1985), *affirming,* 600 F.Supp. 268 (S.D.N.Y.1984). The ATDA, not Murphy, represents the MP dispatchers. The dispatchers may change that representative status by evoking the proper statutory procedures to depose the ATDA.